UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SK NETWORKS COMPANY LIMITED, a South Korean corporation, | ) ) ) | CASE NO. CV 12-08997 MMM (SHx) |
| Plaintiff, | ) ) ) | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |
| vs. | ) ) | |
| BENTLEY FORBES HOLDINGS, LLC, a Delaware limited liability company, | ) ) ) | |
| Defendant. | ) ) ) ) ) ) | |

On October 18, 2012, SK Networks Company Limited ("SKN") commenced this action against BentleyForbes Holdings, LLC ("BF Holdings").[1] On November 13, 2012, BF Holdings answered the complaint,[2] but on March 4, sought leave to file a first amended answer and counterclaims.[3] The court granted the motion on May 6, 2013.[4] BF Holdings filed an amended

---

[1]Complaint, Docket No. 1 (Oct. 18, 2012), ¶ 4.

[2]Answer, Docket No. 13 (Nov. 13, 2012).

[3]Motion for Leave to File First Amended Answer and Counterclaims, Docket No. 38 (Mar. 4, 2013); see also Reply to Plaintiff's Opposition to Defendant's Motion for Leave to File First Amended Answer and Counterclaims, Docket No. 41 (Apr. 22, 2013).

[4]Order Granting Defendant Bentley Forbes Holdings, LLC['S] Motion for Leave to File First Amended Answer and Counterclaims, Docket No. 43 (May 6, 2013).

answer and counterclaims on May 28, 2013, alleging claims for breach of contract as a third party beneficiary, breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief.[5]  On September 23, 2013, SKN filed a motion for summary judgment on its affirmative claim and BF Holdings's counterclaims.[6]  BF Holdings opposes the motion.[7]

## I. BACKGROUND

SKN is a South Korean corporation.[8]  BF Holdings is a Delaware limited liability company doing business in California.[9]  It is part of the Bentley Forbes Group of companies, which also includes Bentley Forbes Equities, LLC ("BF Equities").[10]  On December 30, 2011, BF Holdings executed a written promissory note (the "Note") in favor of SKN, memorializing its obligation to pay SKN $11,653,922.60 on or prior to February 29, 2012.[11]  SKN alleges that the Note also obligated BF Holdings to pay SKN on demand "all legal and other costs and expenses of every kind and description, including reasonable attorneys' fees and disbursements, relating to the

---

[5]First Amended Answer, Counterclaims, Docket No. 52 (May 28, 2013), Counterclaims, ¶¶ 35-72.  The "Amended Answer" contains numbered paragraphs 1-14; "Affirmative Defenses" include numbered paragraphs 1-15; and "Counterclaims" include numbered paragraphs 1-72.  The court references the relevant section of the pleading as well as paragraph numbers throughout this order.

[6]Motion for Summary Judgment ("MSJ"), Docket No. 60 (Sept. 23, 2013).

[7]Opposition to Motion for Summary Judgment ("Opposition "), Docket No. 61 (Sept. 30, 2013).

[8]Complaint, Docket No. 1 (Oct. 18, 2012), ¶ 2.

[9]*Id.*, ¶ 3.

[10]Declaration of C. Frederick Wehba ("Wehba Decl."), Docket No. 61-2 (Sept. 30, 2013), ¶ 1.

[11]SK Networks's Statement of Uncontroverted Facts ("SUF"), Docket No. 60-3 (Sept. 23, 2013), ¶ 1.  BF Holdings does not respond to this and several other of SKN's other proposed uncontroverted facts.  The court therefore deems the facts undisputed.  Where BF Holdings has failed to respond to a proposed fact, the court cites only the relevant paragraph of SKN's statement of undisputed facts.

collection and/or enforcement of th[e] Note or of any rights [t]hereunder."[12]   The Note is
governed by New York law.[13]   SKN allegedly demanded payment from BF Holdings, which
purportedly refused to pay in accordance with the terms of the Note.[14]   BF Holdings has failed to
pay any portion of the $11,653,922.60 owed to date.[15]

On December 30, 2011, the same day the Note was signed, SKN and BentleyForbes
Equities, LLC ("BF Equities") entered into a Sale and Purchase Agreement ("SPA"),[16] pursuant
to which SKN agreed to sell certain real property located in Seoul, South Korea to BF Equities
for approximately $25 million.[17]   The SPA states that it is "governed and interpreted by the Laws
of Korea," and that "any disputes arising out of [the] Agreement shall be brought to the
jurisdiction of the Seoul Central District Court."[18]   Concurrent with the sale of the property to BF
Equities and pursuant to the SPA, SKN and BF Equities entered into a lease agreement in which
BF Equities agreed to lease the property to SKN for a period of at least twenty years, and SKN
agreed to pay rent to BF Equities for that period (the "Lease Agreement").[19]

The sale/leaseback transaction was documented in a set of interrelated and concurrently
executed agreements, which included the SPA, the Lease Agreement, and a Closing Statement.[20]
Section 1.1 of the SPA defines "Transaction Documents" as "this Agreement, the short-form

---

[12]Declaration of Nitin Reddy ("Reddy Decl."), Docket No. 60-1 (Sept. 23, 2013), Exh.
2-A ("Note"), § 3.

[13]*Id.,* § 5.

[14]Complaint, ¶ 7.

[15]SUF, ¶ 2.

[16]SUF, ¶ 4.

[17]Wehba Decl., Exh. A (Sale and Purchase Agreement ("SPA")), §§ A, B, 1.1, 2.2.

[18]SUF, ¶ 5; SPA, § 11.8.

[19]Reddy Decl., Exh. 6, Lease Between BentleyForbes Equities, LLC and SK Networks
Company Limited ("Lease Agreement"), § 11; Wehba Decl., Exh. C (same).

[20]SPA, § 1.1.

Korean language Purchase and Sale Agreement, Seller's Power of Attorney for Court Registration of Title Transfer, Seller's Closing Documents and Purchaser's Closing Documents." Section 11.6 states that the SPA and other Transaction Documents collectively constitute "the full and entire understanding and agreement among the parties."[21]

The Closing Statement reflected SKN's obligation to pay various entities approximately $1.3 million for legal costs, title insurance costs, appraisal/due diligence costs, and financial advisory costs.[22] It also reflected BF Equities' obligation to pay SKN $23,892,677. Of this amount, $11,653,922.60 was to be in the form of a promissory note issued in SKN's favor.[23] In addition, BF Equities was to obtain two bridge loans totaling $10,988,754.40, using the property as collateral, the proceeds of which would be paid to SKN.[24] The Closing Statement required that, until financing for the sale/purchase agreement was secured and the Note fully paid, SKN pay interim rent of approximately $50,000 per month to BF Equities.[25] Section 7 of the Closing Statement referenced Annex A, which provided for the unwinding of the transaction, repayment of the bridge loan, return of the property to SKN, and allocation of transaction costs in the event the Note was not paid.[26]

BF Holdings alleges that during negotiation of the sale/leaseback transaction, SKN

---

[21]*Id.*, §§ 1.1, 11.6.

[22]Wehba Decl., Exh. B (Closing Statement), § 1.

[23]*Id.*, §§ 2, 3(a).

[24]*Id.*, § 3(b); see also Wehba Decl., ¶ 12. The Note and bridge loans did not total $23,892,677, because BF Equities was to deduct the amount of the security deposit due under the Lease Agreement from the purchase price, which was to be wired to Bentley Forbes AMC, an affiliate of BF Equities. (See Closing Statement, § 3(c); see also Wehba Decl., Exh. B (Lease Statement), ¶ 24.)

[25]*Id.*, § 6.

[26]Closing Statement, § 7; Annex A, ¶¶ 1-2.

represented to BF Equities that it had "investment grade" credit.[27] BF Equities asserts that SKN's credit was a material aspect of the transaction because BF Equities' ability to obtain financing for the property's purchase price was dependent on SKN's creditworthiness.[28] BF Holdings contends that SKN's representations regarding its creditworthiness were false, and that, as a consequence, BF Equities was unable to secure financing to complete the transaction. It was for this reason, BF Holdings asserts, that the Note was not paid.[29]

---

[27]Wehba Decl., ¶ 19. SKN objects to this statement. (Plaintiff SK Networks' Evidentiary Objections (Objections), Docket No. 62-3 (Oct. 7, 2013) at 30-31.) First, it asserts that the statement assumes facts not in evidence, specifically, that the parties intended that the deal be a credit tenant lease ("CTL") transaction and that BF Equities' failure to obtain financing meant it could not pay the Note. Wehba has established that he has personal knowledge of the transaction and the negotiations leading to it because he is the Chairman of the Bentley Forbes Group of companies and was "personally involved in the negotiation and documentation of the transaction at issue in this proceeding." (Wehba Decl., ¶ 1.) Wehba's declaration constitutes evidence that the parties intended to enter into a CTL transaction. (*Id.*, ¶ 3.) The objection is therefore overruled. Second, SKN objects that the evidence is inadmissible under Rule 403 of the Federal Rules of Evidence in that it is misleading. It asserts that BF Equities had a lender in mind that did not require a specific credit rating. Rule 403 permits the exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED.R.EVID. 403. Wehba's statement is highly probative of BF Equities' view of the transaction, and of its reasons for wanting to have the transaction unwound in the event financing could not be obtained. The fact that SKN cites contradictory evidence does not make Wehba's statement unduly prejudicial or likely to mislead the jury. SKN's objection is therefore overruled.

[28]Wehba Decl., ¶ 19. SKN objects that this statement contradicts the terms of the SPA, which does not make financing a condition of performance, and is thus inadmissible parol evidence. (Objections at 31-32.) "[W]here the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations between the parties offered to contradict or modify the terms of their writing." *Marine Midland Bank-Southern v. Thurlow*, 53 N.Y.2d 381, 387 (1981). Wehba does not assert that the SPA made the transaction contingent upon BF Equities' success in securing financing; he merely asserts that the fact that SKN allegedly had investment grade credit was a material inducement causing BF Equities to enter into the transaction. The objection is therefore overruled.

[29]*Id.* SKN contends Wehba's testimony that representations concerning SKN's creditworthiness were made by SKN's "agents" contradicts his sworn deposition testimony, in

which he reported that the representations were made by a third party broker. (Objections at 32-33.) An agent need not be an employee of the principal. See *Doctors' Co. v. Superior Court*, 49 Cal.3d 39, 46 n. 4 (1989) (holding that independent contractors were an insurer's agents). Consequently, this objection is overruled. SKN also asserts that Wehba lacks personal knowledge as to who SKN's agents were. (*Id.* at 33-34.) As chairman of the Bentley Forbes Group of companies and given his personal involvement in the transaction, Wehba has personal knowledge of BF Holdings's interactions with SKN and its purported agents, and/or those holding themselves out as SKN agents. See *Gulf Ins. Co. v. TIG Ins. Co.*, 86 Cal.App.4th 422, 439 (2001) ("'To establish ostensible authority in an agent, it must be shown the principal, intentionally or by want of ordinary care has caused or allowed a third person to believe the agent possesses such authority" (internal quotation marks omitted)). Accordingly, this objection is overruled. SKN also objects that if Wehba's testimony is based on out of court statements or other documents it is inadmissible hearsay. (*Id.* at 33-34.) Statements "offered against an opposing party" and "made by the party's agent or employee within a scope of that relationship and while it existed" are not hearsay. FED.R.EVID.802(d)(2). Wehba is testifying to statements made by SKN's purported agents. Thus, this objection is overruled. SKN also contends that Wehba's statement that BF Equities' ability to obtain CTL financing depended upon the creditworthiness of SKN is inadmissible expert testimony. (*Id.* at 1, 34.) "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of rule 702. FED.R.EVID.701. Because he is the chairman of the Bentley Forbes Group, Wehba is competent to testify regarding particularized knowledge gained from the position he holds in his business. See FED.R.EVID.701, Advisory Committee Note (2000) ("[M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis"); *United States v. Muñoz-Franco*, 487 F.3d 25, 35 (1st Cir. 2007) ("Somohano's testimony was based on knowledge of Caguas' banking practices that he acquired during his employment there, and thus the opinions he expressed were properly within the scope of Federal Rule of Evidence 701"). Wehba reports that he has been involved in other CTL deals. (Wehba Decl., ¶ 3.) Accordingly, his prior business experience and his position at Bentley Forbes Group provide adequate foundation for his statement regarding the importance of the lessee's creditworthiness in securing CTL financing. SKN's objection is overruled. Finally, SKN asserts that its credit rating is irrelevant. (*Id.* at 34.) Rule 402 of the Federal Rules of Evidence requires that all evidence introduced at trial be relevant. FED.R.EVID. 402 ("All relevant evidence is admissible . . . . Evidence which is not relevant is not admissible"). "Relevant evidence" is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401. Here, SKN's credit rating is highly probative with respect to BF Holdings's counterclaim

BF Holdings alleges that SKN breached the integrated agreement comprised of the SPA, Closing Statement, Lease Agreement and Note in several ways. First, it asserts that SKN misrepresented its credit, breaching a provision of the SPA requiring that all information provided by SKN in connection with the transaction be true, complete, and accurate in all material respects.[30] Second, it asserts that SKN breached the Closing Statement by failing to pay the interim monthly rent of $50,000.[31] Third, it contends that SKN breached the Lease Agreement and Closing Statement by failing to pay the $1,250,000 security deposit.[32] Fourth, it argues that SKN breached the Closing Statement by failing to pay legal, title insurance, appraisal, due diligence, and financial advisory costs totaling $1,322,455.[33] Finally, BF Holdings contends that SKN breached the Closing Statement by retaining the bridge loan proceeds, even though the statement required that it return the funds to the bridge loan lenders if BF Equities was unable to secure financing for the full purchase price as contemplated.[34] On February 25, 2013, BF Equities purportedly assigned any claims, demands, and causes of action it had against SKN under the SPA

alleging that SKN breached a provision in the Transaction Documents that warranted that all information provided during negotiations and due diligence was true. This objection too must therefore be overruled.

[30]Counterclaims, ¶ 25.

[31]*Id.*, ¶ 26.

[32]*Id.*, ¶ 27.

[33]*Id.*, ¶ 28. This paragraph erroneously states that the amount due was "1,322,544 million." Elsewhere, the counterclaims state that the costs are "$1,322,455," (*id.*, ¶ 18), which is the figure found in the Closing Statement (Closing Statement, § 1).

[34]*Id.*, ¶ 29.

to BF Holdings.[35]

## II. DISCUSSION

### A.    Standard Governing Motions for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits or moving papers is insufficient to meet this burden, or raise genuine issues of fact defeating summary judgment. See *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

"It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988). "At the summary judgment stage," however, courts "do not focus on the

---

[35]SUG ¶ 8; SGI ¶ 8; Wehba Decl., Exh. D, Assignment.

8

admissibility of the evidence's form. [They] instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001), and *Federal Deposit Ins. Corp. v. New Hampshire Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991)); see *Cutrona v. Sun Health Corp.*, No. CV 06-2184-PHX-MHM, 2008 WL 4446710, *7 (D. Ariz. Sept. 30, 2008) (on summary judgment, "hearsay is admissible if there is any way to present it in an admissible form at trial"); see also *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) ("On motions for summary judgment, we may consider only that evidence which can be reduced to an admissible form").

In judging the evidence presented in support of or opposition to summary judgment, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). Nonetheless, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**B.      Whether SKN is Entitled to Summary Judgment on its Breach of Promissory Note Claim**

**1.      Whether SKN has Established a *Prima Facie* Case of Breach**

"To establish a prima facie case for the recovery [for] a breach of contract to pay a promissory note, 'the plaintiff simply must show proof of the note and the defendant's failure to pay by its maturity date.'" *HICA Educ. Loan Corp. v. Yunatanov*, No. 11 CV 488(SJ)(RER), 2013 WL 3288452, *2 (E.D.N.Y. June 28, 2013) (citing *In re RMM Records & Video Corp.*, 372 B.R. 603, 609 (Bankr. S.D.N.Y. 2007)). "The plaintiff must show that (1) the defendant signed the promissory note; (2) the party seeking enforcement is the present holder or owner of the note; and (3) that the note is in default." *Id.* (citing *United States v. Petroff–Kline*, 557 F.3d 285, 290 (6th Cir. 2009); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001); *Camofi Master LDC v. College Partnership, Inc.*, 452 F.Supp.2d 462, 470 (S.D.N.Y.2006)). In the context of

9

a motion for summary judgment, "[o]nce the *prima facie* case is established, then 'the burden shifts to the defendant to prove the 'existence' of a triable issue of fact in the form of a bona fide defense against the note.'" *Id.* at *3 (citing *Camofi Master*, 452 F.Supp.2d at 470).

Here, it is undisputed that (1) BF Holdings signed the Note,[36] (2) SKN, the party seeking to enforce the Note, is its holder,[37] and (3) although the Note has matured, no payments have been made, and the Note is consequently in default.[38] Accordingly, SKN has established a *prima facie* case, and the burden shifts to BF Holdings to demonstrate the existence of triable issues of fact in the form of a bona fide defense.

### 2. Whether Bf Holdings Has Demonstrated That It Has a Bona Fide Defense

BF Holdings asserts two defenses to enforcement of the Note. First, it contends the Note is one of several documents that form part of a single interrelated transaction, and that the other documents affect the enforceability of the Note. Second, it asserts that the Note is unenforceable as a standalone document because viewed in isolation, it fails for lack of consideration. The court addresses the arguments in turn.

### a. Whether N.Y. Uniform Commercial Code § 3-119 Applies

BF Holdings's first defense is that the Note is inextricably intertwined with the Transaction Documents, which affect its terms and enforceability.[39] It cites New York Uniform Commercial

---

[36]SUF, ¶ 1.

[37]*Id.*

[38]*Id.*, ¶¶ 1-2.

[39]Opposition at 3, 13, 15; see also Wehba Decl., ¶ 4. SKN objects to Wehba's testimony on three grounds. (Objections at 7-10.) First, it asserts the testimony should be excluded under the best evidence rule. Rule 1002 of the Federal Rules of Evidence states: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required." FED.R.EVID. 1002. Here, Wehba's testimony is offered to show the intent of the parties in executing the Note and Transaction Documents; it is not offered to prove the contents of the writings. The best evidence rule has no application where evidence "submitted [is] not offered to prove 'the content of a writing.'" *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016,

Code ("N.Y. U.C.C.") § 3-119 in support of this argument.[40]  Section 3-119(1) provides: "As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction, except that a holder in due course is not affected by any limitation of his rights arising out of the separate written agreement if he had no notice of the limitation when he took the instrument." N.Y. U.C.C. § 3-119 (McKinney).  An "instrument" means "a negotiable instrument," N.Y. U.C.C. § 3-102 (McKinney), and includes promissory notes, see N.Y. U.C.C. § 3-104(2)(d)

---

1023 (9th Cir. 2001).  This objection is therefore overruled.  Second, SKN objects that the testimony is inadmissible under Rule 403.  Wehba's statement is highly probative with respect to whether New York Uniform Commercial Code § 3-119 affects the enforceability of the Note. There is no apparent danger of unfair prejudice that outweighs its probative value.  Thus, this objection is also overruled.  Third, SKN objects that the testimony is inadmissible under the parol evidence rule because it purports to change the SPA's definition of "Transaction Documents." Here, the issue is whether the Note and Transaction Documents are part of the same transaction under § 3-119; if the Note is part of the same transaction, it is not extrinsic evidence because it is part of the contract and thus the parol evidence rule does not apply.  See *Edward A. Kemmler Memorial Found. v. 691/733 East Dublin-Granville Road Co.*, 62 Ohio St.3d 494, 498, 584 N.E.2d 695, 698 (Ohio 1992) (applying UCC § 3-119 and stating "parol evidence as such is not necessary in this case"); *id.* at 499-500 (collecting cases); *Nowak v. Burke Energy Corp.*, 227 Neb. 463, 465-66, 418 N.W.2d 236, 239 (1988) ("The issue in this case is whether the agreement and the promissory note together provide for the accrual of interest.  The appellant apparently argues that only the note may be considered and that parol evidence may not be received to vary or add to the terms of a written agreement. Appellant admits in its brief, however, that the general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction are legally one instrument and will be construed together as if they were as much one in form as they are in substance.  While it is clear that the parol evidence rule would exclude evidence, whether parol or otherwise, of antecedent understandings and negotiations and would not permit the admission of same for the purpose of varying or contradicting the written contract, yet in this case the appellee does not rely on parol evidence of antecedent understandings and negotiations, but, rather, appellee relies on the written agreement dated March 15, 1979, between appellee and Nebraska Propane, Inc. . . .  The effect of the parol evidence rule, in its exclusion of extrinsic written documents, is very limited, in view of the universally accepted proposition that instruments executed at the same time, as a part of the same transaction, and intended by the parties as one contract, will be so construed.  Under this rule it is held that a note, together with a mortgage securing it, will be construed together as one contract" (citations omitted)).  As a result, the court overrules SKN's final objection.

[40]Opposition at 11.

(McKinney) ("A writing which complies with the requirements of this section is a 'note' if it is a promise other than a certificate of deposit").

The official comment to § 3-119 explains that a "separate writing" may "be any type of contract, including an agreement that upon certain conditions the instrument shall be discharged or is not to be paid[.]" Comment, N.Y. U.C.C. § 3-119, cmt. 1. "The section applies to negotiable instruments the ordinary rule that writings executed as a part of the same transaction are to be read together as a single agreement. As between the immediate parties a negotiable instrument is merely a contract and is no exception to the principle that the courts will look to the entire contract in writing." *Id.*, cmt. 3. "If there is outright contradiction between the two, as where the note is for $1,000 but the accompanying mortgage recites that it is for $2,000, the note may be held to stand on its own feet and not to be affected by the contradiction." *Id.*

Citing *Hauser v. Western Group Nurseries, Inc.*, 767 F.Supp.475, 489-90 (S.D.N.Y. 1991), BF Holdings argues that § 3-119 governs the enforceability of the Note.[41] In *Hauser*, Arizona World Nurseries, a limited partnership that was intended to be a tax shelter, purchased the assets of a second entity, World Nurseries, Inc. It paid for the assets in part by issuing a $26.5 million wraparound note. *Id.* at 479-80. World had acquired the assets Arizona World purchased from a third entity, Western United Nurseries ("WUN"), and had paid for them in part by giving WUN a non-recourse promissory note for $17 million; the note was secured by various assets under a security agreement executed in connection with the WUN/World closing. *Id.* at 479-80.

The security agreement provided that World would transfer the wraparound note to WUN, and that WUN would have no right to sue the partners of Arizona World personally to recover the sums due. *Id.* at 480. After the transactions were complete, World defaulted on its obligations to WUN. *Id.* at 481. WUN obtained a court judgment allowing it to foreclose on the assets provided as security; the assets and the wraparound note were sold to Western Group Nurseries ("WGN"), an entity comprised of WUN and its affiliates. *Id.* at 481-82. WGN then attempted

---

[41]*Id.* at 11-12.

12

to enforce the wraparound note against each of Arizona World's limited partners to the extent of the partner's pro rata share. *Id.* at 482-83. It challenged the incorporation by reference of the security agreement's limitation on enforcement of the note, and argued that U.C.C. § 3-119 did not apply, *inter alia*, because (1) the note was not executed as part of the same transaction as the security agreement, and (2) the note made no reference to the security agreement. *Id.* at 489. The court rejected both arguments. *Id.* It concluded that World/WUN and World/Arizona World "transactions were inextricably linked as components of an overall transaction," because the operative agreements included numerous references and cross-references to the various contracts comprising the World/Arizona World transaction and because "the transactions in fact did close virtually simultaneously." *Id.* at 490.

Here, like the transactions in *Hauser*, the Note and the Transaction Documents were executed on the same day.[42] Also like the transaction documents in *Hauser*, the documents refer to one another. Section 3.2 of the SPA states that the purchase price shall be paid in accordance with the Closing Statement.[43] The Closing Statement, in turn, states that the method of payment

---

[42]Wehba Decl., ¶ 13.

[43]SPA, § 3.2. SKN argues that the Closing Statement does not appear to have been authorized by BF Equities and thus does not constitute a binding agreement. (MSJ at 6.) It cites as evidence a January 4, 2012 email from BF Equities' attorney Tim Pecci, to Kim & Chang, its Korean counsel. (Reddy Decl., Exh. 2 at 160.) In the email, sent one week after execution of the SPA and other documents, Pecci stated that "BentleyForbes ha[d] approved a Closing Statement dated December 30, 2011," which Pecci attached to the email "unexecuted." "After closing," Pecci continued, "we were provided with a sealed version of the Closing Statement attached to this email, sealed by [Kim & Chang] on behalf of BentleyForbes pursuant to the Limited POA." Pecci expressed concern that the security deposit required by § 3(c) of the Closing Statement had not been paid, and asserted that this was "a violation of the Closing Statement and . . . call[ed] into question the validity of the closing." He also expressed concern about changes made to the executed Closing Statement because it had "never been approved by BentleyForbes." Specifically, he noted that the sealed Closing Statement approved by Kim & Chang eliminated all reference to the brokerage fee, while the version BF Equities had approved stated that the fee would be paid at closing.

This evidence does not establish that the Closing Statement is not a binding contract. Pecci's email indicates that Kim & Chang executed a version of the Closing Statement different than the one BF Equities had approved. Kim & Chang, however, had the authority to execute the

shall include issuance of a Note in the amount of $11,653,922.60[44] – the precise amount of the

Note issued in favor of SKN and executed the same day as the Closing Statement and SPA.[45]

---

Closing Statement because Wehba had given the firm power of attorney to execute the Closing Statement upon receiving instructions from him to do so. (Reddy Decl., Exh. 1 at 173:6-8; *id.* at 69 ("Power of Attorney"), § 1(b); *id.* at 72.) The power of attorney also gave Kim & Chang authority "[t]o engage in any and all acts, things or activities which are related, incidental or conductive, directly or indirectly, to the attainment of the foregoing objectives." Significantly, Wehba testified that the Closing Statement *had been* executed. He testified that"[t]he Note was executed on December 30, 2011, along with the other Transaction Documents"; among these, he stated, was the Closing Statement. (*Id.*, ¶¶ 5, 13.) At a minimum, therefore, there are triable issues of fact as to whether the Closing Statement constituted part of a binding contract.

[44]Closing Statement, § 3(a).

[45]Reddy Decl., Exh. 2-A (Note); Wehba Decl., Exh. A (SPA); *id.*, Exh. B (Closing Statement). Although the Closing Statement is not included in the SPA's definition of "Transaction Documents," it is not inadmissible parol evidence. The court can consider the Closing Statement under § 3-119 and the incorporation by reference doctrine. "Under New York law, 'a paper referred to in a written instrument and sufficiently described may be made a part of the instrument as if incorporated into the body of it.'" *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996) (quoting *Jones v. Cunard S.S. Co.*, 238 A.D. 172, 173 (1933)). See also *Mayo v. Royal Ins. Co. of America*, 242 A.D. 2d 944, 945, 662 N.Y.S.2d 654 (N.Y. App. Div. 1997) ("While generally the purpose of a written instrument should be gleaned from the instrument itself, '[e]xtrinsic matters such as letters and other instruments may be construed as part of a contract where they are referred to therein or annexed thereto,'" quoting *Sbarra v. Totolis*, 191 A.D.2d 867, 870 (1993); 11 Richard A. Lord, WILLISTON ON CONTRACTS § 30:25 (4th ed. 1999) ("When a writing refers to another document, that other document, or the portion to which reference is made, becomes constructively a part of the writing, and in that respect the two form a single instrument. The incorporated matter is to be interpreted as part of the writing. Although it is clear that whether one agreement has incorporated another has factual components, whether material has been incorporated presents a question of law"); *Shark Information Srvs. Corp. v. Crum and Forster Commercial Ins.*, 222 A.D.2d 251, 252, 634 N.Y.S.2d 700 (N.Y. App. Div. 1995) ("Incorporation by reference, of course, is appropriate only where the document to be incorporated is referred to and described in the instrument as issued so as to identify the referenced document 'beyond all reasonable doubt,'" quoting *Matter of the Bd. of Commrs.*, 52 N.Y. 131, 134 (N.Y. 1873); *Chiacchia v. Natl. Westminster Bank, USA*, 124 A.D.2d 626, 628 (N.Y. App. Div. 1986)).

The SPA clearly identifies the Closing Statement and refers to it repeatedly. Section 1.1 of the SPA defines "Closing Statement" as "the settlement agreement, dated December 30. 2011, entered into and between Seller and Purchaser in relation to, among other things, the settlement of the Purchase Price and other expenses to be paid on the Closing Date." This detailed definition identifies the Closing Statement "beyond all reasonable doubt." Section 3.2 of the SPA provides

Although the Note does not reference the SPA or the Closing Statement, the note in *Hauser* likewise did not mention the other documents the court found were part of the same transaction. 767 F.Supp. at 489. See also *CTI of Long Island v. Feingold*, No. 602446/2008, 2009 N.Y. Misc. LEXIS 5539, *8-9 (N.Y. Sup. Ct. Jan. 9, 2009) (declining to grant summary judgment in an action seeking the payment of a promissory note, where defendant alleged plaintiff had breached its consulting agreement and non-competition covenants, because "although the Note makes no reference to the Purchase Agreement, the Non-Compete Covenants or the Consulting Agreement, the Purchase Agreement specifically refers to the Note, the amount of the Note, which was the same as the purchase price, and the terms of repayment. In fact, a copy of the Note was annexed to the Agreement").[46] Given the repeated references in the SPA to the Closing Statement, and the Closing Statement's specific mention of the Note, the court concludes that the SPA, Closing Statement, and Note constitute a single transaction as a matter of law.[47]

─────────────

that the "Purchaser shall pay and bear the Purchase Price in accordance with the Closing Statement." In addition, sections 2.2, 3.3, 4.3, 4.4, 6.2(o)-(s), 8.1(e), and 11.3 of the SPA refer to the Closing Statement. Paragraph 7 of the Closing Statement incorporates Annex A. Because the SPA refers repeatedly to the Closing Statement, which itself incorporates Annex A, the court may refer to both in interpreting the agreement. Paragraph 7 of the Closing Statement states: "In the event Purchaser fails to honor the Note under Section 3(a) of this Closing Statement and pay to Seller the sum payable under the Note in accordance with its terms, Purchaser and Seller shall unwind the transactions contemplated under the SPA in accordance with the provisions of Annex A to this Closing Statement."

[46]As SKN notes, *CTI of Long Island* is an unpublished trial court order decision that is not considered precedent under New York law. See *Yellow Book of NY L.P. v. Dimilia*, 188 Misc.2d 489, 491 (N.Y. Sup. Ct. 2001). The court nevertheless considers the case for its persuasive value. See *id.* at 490 ("[U]npublished decisions may still be considered as persuasive authority").

[47]Because the SPA refers to and incorporates the Closing Statement, and the Closing Statement specifically discusses the Note, this case is distinct from *Federal Deposit Ins. Corp. v. Borne*, 599 F.Supp. 891 (E.D.N.Y. 1984). There, the defendant argued that a note executed in favor of a bank and a letter of credit issued in his favor by the bank were part of the same transaction, and thus that his obligation to pay the note was conditioned on the bank's agreement to make the last of a series of advances under the letter of credit. *Id.* at 893. As the court noted, "neither the note nor the letter of credit refer[red] to one another." *Id.* Rather, the defendant offered parol evidence in the form of declarations concerning the relationship between the note and the letter of credit. *Id.* The court observed: "[T]o satisfy § 3–119(1), the 'written agreement'

SKN argues that *Hauser* is distinguishable because (1) the parties to the notes and the security agreement in that case were the same; (2) the security agreement expressly altered the terms of the note; (3) the court's interpretation of the agreement did not render the promissory note a nullity, and (4) *Hauser* concerned only whether certain persons could be held personally liable under the note, not whether the note was enforceable.[48] The *Hauser* court did not rely on any of these factors in reaching the conclusion it did, however, and SKN neither cites authority stating that they are dispositive in applying § 3-119 nor offers argument as to why the court should so hold in this case. SKN's first argument, moreover, misstates the facts of *Hauser*. In *Hauser*, the note and security agreement were entered into by *different* parties. The wraparound note was executed by Arizona World and delivered to World. 767 F.Supp. at 480. The security agreement, however, was between World and WUN. *Id*. The court nonetheless held that the security agreement modified the terms of the wraparound note by making the note unenforceable against Arizona World's limited partners. *Id*. at 489. *Hauser*, therefore, imposes no "same parties" limitation on the rule that an instrument may be modified by a written agreement entered into as part of the same transaction.

To the extent SKN's second argument suggests express language is required to give contract terms effect, this misstates New York law regarding contract interpretation. A contractual provision need not be express to be given effect. See *Dobson v. Hartford Fin. Srvs. Grp., Inc.*, 389 F.3d 386, 399 (2d Cir. 2004) ("Under general principles of contract law, a failure to locate explicit contractual language does not mark the end of proper judicial interpretation and construction. Contracting parties often express their agreements imprecisely or incompletely. In such cases, if the interpreting court can discern from the contract as a whole what the parties must have intended, it should enforce that intention despite a lack of express terminology," citing Lord,

---

must embody whatever modifies or affects the terms of the note. The terms of an otherwise unambiguous and complete note may not be varied by resort to extra-writing evidence as Borne attempts to do in this case." *Id*. at 894. Here, no resort to "extra-writing evidence" is required to determine that the SPA, Closing Statement and Note were part of a single transaction.

[48]Reply at 4-5 n. 1.

16

*supra*, § 31:7 ("It should be noted that terms are to be implied in contract, not because they are reasonable, but because they are necessarily involved in the contractual relationship, such that the parties must have intended them and must have failed to express them only because of sheer inadvertence or because they are too obvious to need expression. In this connection, it has been said that most contracts include implied conditions that are indispensable in effectuating the intentions of the parties" (internal quotation marks omitted)); see also *Sacramento Navigation Co. v. Salz*, 273 U.S. 326, 329, (1927) ("[A] contract includes, not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made").

SKN's third and fourth distinctions of *Hauser* also fail. Section 3-119 states that a written agreement can modify an instrument when executed as part of the same transaction. It says nothing, however, about the permissible *content* of such a modification.

SKN next argues that promissory notes are meant to be enforced according to their terms and without reference to any other agreement, and that courts do not depart from this rule absent a reference in the promissory note to the other agreement.[49] This argument is belied by cases like

---

[49]SKN cites several cases in support of this proposition. During oral argument, it asserted that these cases stand for the proposition that the court must first look to the note to see if it references other agreements. SKN argued that only if the note contains such references is it appropriate to look to the other agreements. SKN first contended that the language of § 3-119 supports this result. The relevant portion of § 3-119, however, states: "As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction." As can be seen, the provision does not make the language of the note controlling, or state that it must contain an explicit reference to another agreement. If anything, the provision suggests that the court must look holistically to determine whether the note and the other agreements were executed as part of the same transaction.

SKN also asserted that the cases cited in its brief articulate a rule that requires that the court look first to the language of the note to determine if it explicitly references other agreements, and that if the note does not, the inquiry must end. It is true that in *Bankers Trust Co. v. F.D. Rich Co., Inc.*, No. 90 Civ. 4827 (KMW), 1991 WL 221091 (S.D.N.Y. Oct. 16, 1991), a court, which concluded that a note was not part of a larger transaction, began its analysis by looking to the language of the note itself. There, a real estate developer and a bank entered into a $50 million

17

loan secured by a mortgage on a proposed mixed used complex the developer planned to construct. The developer executed a "separate" $5 million note for an unsecured line of credit that was to fund the project until the larger loan closed. *Id.* at *1. Approximately a year later, the line of credit note was replaced with a demand note for $5 million. The demand note expressly stated that "[i]n the event this note is made payable on demand, neither the provisions of this paragraph nor anything else contained in this note, shall, in any way, be deemed to limit or prevent [lender] from demanding payment at any time." *Id.* at *2. As evidence that the contracts were part of a single transaction, defendant offered his own parol statement that the parties understood the loans would comprise a single transaction, and that the bank had first to foreclose on the security for the $50 million loan. *Id.* at *2. Defendant also proffered evidence that during the negotiations that ensued after he encountered difficulty paying the loans, the bank represented that it would look first to the security for the $50 million loan before attempting to collect on the $5 million demand note. *Id.* at *4. Noting the demand nature of the note, and declining to consider the parol evidence offered, the court concluded that the note was not part of a larger transaction and that it was payable on demand. *Id.* at *2. Notably, there was no evidence in *Bankers Trust*, as there is here, that other agreements specifically referenced the note or otherwise made clear that it was part of a larger transaction. Indeed, the note in question was executed approximately a year after the larger secured loan had been made. Consequently, the court cannot conclude that *Bankers Trust* stands for the absolute proposition that unless a note makes reference to another agreement, it cannot be considered part of a larger, multi-agreement transaction.

In *Manufacturers Hanover Trust Co. v. Margolis*, 115 A.D.2d 406 (1985), plaintiff sought to recover on a promissory note executed by defendant. *Id.* at 406-07. Defendant argued that the note was part of a transaction between him and a subsidiary of the bank; this transaction involved a purported oral agreement between defendant and the subsidiary pursuant to which he was to be paid for providing certain services to the subsidiary. *Id.* Defendant contended that the loan represented by the note was a "down payment" on the amounts the subsidiary was to pay, "advanced in the form of a loan for income tax purposes." *Id.* at 407. The court rejected defendant's evidence of a prior oral negotiation that allegedly showed the note was intended as partial payment to defendant by the plaintiff's subsidiary, structured in the form of a loan for tax purposes. *Id.* at 407. The court held that "defendant's obligation on an unconditional note complete on its face [could not] be avoided on the basis of a purported contemporaneous oral agreement between [defendant] and [the subsidiary,] to which MHT was not a party." As in *Bankers Trust*, there was no evidence that the agreement with the subsidiary specifically referenced the note; indeed, there could not have been because that agreement was completely oral. Nor was there any evidence concerning the relative timing of the two agreements. Consequently, the case does not stand for the proposition that unless a note makes reference to another agreement, it cannot be considered part of a larger, multi-agreement transaction. I n *Keene Corp v. Bogan*, No. 88 CIV. 0217 (MBM), 1990 WL 1864 (S.D.N.Y. Jan. 11, 1990), defendant executed a promissory note in connection with a sale of the assets of his company, as well as a letter stating the note would be paid from the "earn-out payments" due under the asset purchase agreement. *Id.* *1. The company's earnings were insufficient, however, and no earn-

*Hauser* and *CTI*. This is not a situation in which the instrument offered to alter the terms of the note makes no mention of it; under those circumstances, courts have indeed held that § 3-119 does not apply. See *Ruder v. Lewandowski*, 174 A.D.2d 406, 406, 571 N.Y.S.2d 224 (N.Y. App. Div. 1991) ("In opposition to plaintiff's motion for summary judgment . . . , defendants urged that the purpose of the note was to afford plaintiff evidence of an investment in HLV Realty Corp., of which both defendants are officers and directors, and that the note was satisfied in full by the grant to plaintiff of an equity interest in HLV common stock pursuant to a nominee agreement dated February 25, 1987. There is nothing in that agreement making reference to the promissory note, so that agreement may not serve as an agreement modifying the defendants' obligations pursuant to UCC § 3-119(1)"); see also *Borne*, 599 F.Supp. at 893 ("Significantly, neither the note nor the letter of credit refer to one another. Without the affidavits of Borne, Friedman, and Eichele, a relationship between the note and the letter of credit could not be inferred by reading these documents alone"); *id.* at 894 ("Moreover, to satisfy § 3-119(1), the 'written agreement' must embody whatever modifies or affects the terms of the note. The terms of an otherwise unambiguous and complete note may not be varied by resort to extra-writing

_____

out payments were made. The purchaser ultimately sued defendant on the note. *Id.* at *1-2. The court concluded that because the note and letter "unambiguously provide[d] for [defendant's] repayment of the amount borrowed, and [relied] on [his] earnings under the earn-out provision as but one method of repayment," the purchaser was entitled to recover on the note. *Id.* at *4; see also *id.* at *5 ("Here, there is nothing in the promissory note or the letter that suggests that the earn-out set-offs would be the exclusive source for repaying the note"); *id.* at *6 ("Simply because the letter states that Bogan will not receive earn-out payments until the note is paid does not logically mean that earn-out payments are the only source from which the note is to be paid"). As can be seen, *Keene* did not address contemporaneously executed agreements; to the extent the "letter" could be viewed as an agreement, moreover, the court looked to it as well as the note to determine the terms of the parties' contract. It concluded that they were consistent, and that they did not support defendant's argument. The court thus cannot find that *Keene* supports SKN's argument that it must look first to the terms of the note, and that only if the note specifically references another agreement can it look to that other agreement to determine if the documents were part of a single transaction. Stated differently, none of these cases holds that a promissory note can be modified only by a document to which it specifically refers. In fact, none even cites § 3-119. Consequently, they do not require rejection of BF Holdings's argument that the Note, the SPA and the Closing Statement were part of a single integrated transaction.

19

evidence as Borne attempts to do in this case").

SKN asserts that New York courts have rejected the argument that "a promissory note is somehow altered by the terms of contemporaneous documents." As evidence of this, it cites two cases involving appeals of cases decided under the expedited summary judgment procedure set forth in New York CPRL 3213, which is available in cases involving instruments for the payment of money.[50] In *Logan v. Williamson & Co.*, 64 A.D.2d 466, 409 N.Y.S.2d 883 (N.Y. App. Div. 1978), the court held only that a defendant's allegation that "a contemporaneous but separate contract" had been "executed as part of the same general transaction" was insufficient to prevent plaintiff from utilizing the summary proceeding to secure a judgment on the note.[51] See *id.* at 469 ("Defendant would have us extend th[e summary procedure] rule to hold that despite default, a court may not permit the holder of a promissory note to proceed to judgment if defendant alleges a breach of a separate but contemporaneous contract executed as part of the same general transaction. We do not believe that such a result is warranted"). The court cautioned, however, that "[a] related counterclaim arising from the same transaction . . . [might] preclude plaintiff's motion for summary judgment," because even when the expedited procedure is used, "a section 3213 motion is one for summary judgment, and is subject to the same rules generally applicable to" such motions. *Id.* at 470.[52]

---

[50]MSJ at 11-12.

[51]The *Logan* court described the summary procedure as follows: "[A] creditor in an action on 'an instrument for money only' (and a promissory note whether negotiable or not undoubtedly qualifies as such an instrument) may proceed by summons and motion for summary judgment without the necessity of formal pleading. The justification for this expedited procedure is that such obligations are presumptively valid, and holders of them, in the absence of questions of fact as to authenticity or default, should not be subject to the delay occasioned by formal pleading." *Logan*, 64 A.D.2d at 468-69.

[52]The court did not conclude that the claim defendant asserted – specifically, breach of an employment/non-competition agreement – constituted a related counterclaim arising from the same transaction because it was an independent and unliquidated claim that, although based on an employment agreement that was part of the "same general transaction" as the note, was not related to the note, which reflected compensation to be paid for the sale of corporate equipment and real estate rather than monies owed under the employment agreement. *Id.* at 470.

Similarly, in *Grasso v. John I Shutts Agency, Inc.*, 132 A.D.2d 768, 517 N.Y.S.2d 113 (N.Y. App. Div. 1987), a defendant sued for money due on a promissory note under the expedited procedure of CPLR 3213 asserted that payment of the note was conditioned on plaintiff's performance of an existing employment contract with defendant, and that plaintiff had breached that agreement by diverting clients and accounts to a competitor. *Id.* at 768. The trial court found that these allegations sufficed to raise questions of fact as to plaintiff's entitlement to recover on the note. The appellate court reversed. It noted that defendant had received full consideration for the obligations it assumed in the note, that the note did not set forth that performance of the employment agreement was a condition precedent to defendant's obligations under the note, and that defendant could sue for breach of the employment agreement in a separate action. *Id.* at 769. As the court's decision makes clear, the employment contract was in existence at the time the note was signed; the two contracts were not part of a single transaction, and the case thus does not stand for the proposition that where agreements are part of a single, integrated transaction, the terms of the note cannot be modified or altered by another agreement under N.Y. U.C.C. § 3-119.

At oral argument, SKN argued that the application of § 3-119 to modify the terms of a note has negative public policy implications because this may make it difficult for subsequent owners of a note to determine whether and under circumstances the note can be enforced. This argument ignores the plain language of § 3-119, which provides that "a holder in due course is not affected by any limitation of his rights arising out of the separate written agreement if he had no notice of the limitation when he took the instrument." As comment 4 to § 3-119 explains, "[u]nder this Article a purchaser of the instrument may become a holder in due course although he takes it with knowledge that it was accompanied by a separate agreement, if he has no notice of any defense or claim arising from the terms of the agreement." Accordingly, the hypothetical purchaser SKN posits would be protected by the terms of § 3-119.

### b.   Whether Annex A Renders the Note Unenforceable

The fact that the SPA, Closing Statement, and Note were part of the same transaction under § 3-119 does not, however, end the inquiry. Rather, considering the documents in combination,

21

the court must determine what the parties intended when they executed them. BF Holdings argues that § 7 of the Closing Statement and Annex A preclude SKN from enforcing the Note because they provide the exclusive remedy in the event the Note is not paid.[53] Section 7 of the Closing Statement states: "In the event Purchaser fails to honor the Note under Section 3(a) and pay to Seller the sum payable under the Note in accordance with its terms, Purchaser and Seller shall unwind the transactions contemplated under the SPA in accordance with the provisions of Annex A to this Closing Statement." Annex A states that if the Note is not paid, SKN will repay the proceeds of the bridge loans directly to the lender, BF Equities will return the property to SKN as soon as commercially practicable following repayment of the bridge loans, and, assuming the loan required to consummate the transaction could not be obtained, the parties will pay the aggregated costs associated with the transaction in equal shares.

SKN argues that these provisions were to apply only if the "Purchaser" was the maker of the Note and failed to honor it.[54] The SPA defines "Purchaser" as BF Equities,[55] and the Closing Statement and Annex A incorporate this definition.[56] The entity that made and failed to honor the Note, however, was BF Holdings. SKN contends that it requested the addition of paragraph 7,[57] and that that paragraph and Annex A were intended to protect it in the event BF Equities was the maker of the Note and was unable to pay it.[58] SKN asserts such protection was necessary because BF Equities is a special purpose entity whose only asset was the property;[59] consequently, efforts

---

[53]Opposition at 5-6.

[54]*Id.* at 13-14.

[55]SPA, ¶ B.

[56]See Closing Statement at 1 ("All capitalized terms otherwise not defined herein shall have the meaning given to such terms in the SPA").

[57]Reply at 6-7.

[58]MSJ at 13-14.

[59]Reddy Decl., Exh. 2 (Aug. 16 Wehba Depo.) at 67:4-5, 17-23.

to enforce the promissory note against BF Equities would have been futile.[60]  BF Equities asserts

that, for this reason, SKN insisted that BF Holdings be the maker of the Note.[61]

Both parties proffer evidence to explain why BF Holdings is the payor on the Note. "[W]here the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations between the parties offered to contradict or modify the terms of their writing." *Marine Midland Bank-Southern*, 53 N.Y.2d at 387.  "Parol evidence – evidence outside the four corners of the document – is admissible only if a court finds an ambiguity in the contract." *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (N.Y. 2013).  Section 11.6 of the SPA contains a merger clause,[62] which requires application of the parol evidence rule. *Primex Intern. Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 599 (N.Y. 1997) ("Courts and commentators addressing the substantive and procedural aspects of New York commercial litigation agree that the purpose of a general merger provision, typically containing the language found in the clause of the parties' 1995 Agreement that it 'represents the entire understanding between the parties,' is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing").  As a result, extrinsic evidence is inadmissible to contradict or modify the terms of the SPA, including its definition of "Purchaser."

The definition of "Purchaser" is not ambiguous; when the SPA, Closing Statement, and Note are viewed as part of a single transaction, however, there is arguably an inconsistency because the Closing Statement provides that the Purchaser, defined by the SPA as BF Equities,

---

[60]Reply at 6.

[61]Counterclaims, ¶ 38; Reddy Decl., Exh. 2 (Aug. 16 Wehba Depo.) at 275:15-17; *id.*, Exh. 3 (Aug. 24 Wehba Depo.) at 351:17-352:1.

[62]Section 11.6 of the SPA states: "Entire Agreement: This Agreement and the other Transaction Documents (including the Exhibits and Schedules thereto) constitute the full and entire understanding and agreement among the Parties and supersede all prior understandings, negotiations and prior agreements between or among the Parties with regard to the subject matters hereof and thereof."

will sign a Note in favor of SKN, while the Note was in fact executed by BF Holdings. Even were the court to conclude that this provides a basis to admit the extrinsic evidence proffered by the parties, much of the evidence does not compel an interpretation of "Purchaser" that would include BF Holdings. SKN has proffered evidence that it asked that BF Holdings be the maker of the Note.[63] It has also offered Wehba's deposition testimony that SKN desired that "someone substantial" make or guarantee the Note.[64] BF Holdings has adduced evidence that it became the maker of the Note because SKN wanted to close the transaction by December and financing was not yet in place that would permit BF Equities to sign the Note.[65] While this evidence explains the reasons why BF Holdings was the maker the Note, it does not suggest that the parties' definition of Purchaser is ambiguous, or that the term was intended to apply to a broader category of entities than BF Equities. BF Holdings has also proffered evidence that the parties did not intend that the Note would be paid, because they understood that either BF Equities would obtain 100% financing, which would effectively replace the Note and the bridge loans, or the transaction would be unwound under Annex A.[66] To give effect to BF Holdings's belief that Annex A applies

---

[63]Reddy Decl., Exh. 2 at 275:15-18.

[64]Reddy Decl., Exh. 2 at 275:15-19, 351:16-352:16.

[65]Declaration of Arti I. Bhimani ("Bhimani Decl."), Docket No. 61-1 (Sept. 30, 2013), Exh. 1 (Aug. 16 Wehba Depo.) at 130:12-131:5. It also proffers Webha's testimony that he did "not know why or how BFH came to be listed as the payor of the note." (Wehba Decl., ¶ 13.) SKN objects that this testimony contradicts Wehab's sworn deposition testimony that SKN wanted "someone substantial" on the Note, and that "[BF] Holdings [therefore] had to be on the note." (Objections at 20-21.) Webha's deposition testimony is contradictory as to whether BF Holdings was to be the maker or the guarantor of the Note. At one point, he agrees that BF Holdings was the "intended payor" (Reddy Decl., Exh. 2 at 275:15-19); at another, he agrees that BF Holdings was to be the guarantor of the Noted (*id.* at 351:16-352:16). Because Wehba's deposition testimony indicates that he was unsure whether BF Holdings was to be the maker or guarantor of the Note, and because Webha also testified that he did not know "what happened" after SKN requested that "someone substantial" guarantee the Note because he was not "privy to . . . that," there is no contradiction between his declaration and deposition testimony.

[66]Bhimani Decl., Exh. 1 at 220:1-10 ("Q. Okay. Now, earlier you said that the note was never going to be paid? A. Yes. Q. Why would you need to extend it if it was never going to be paid? A. Well, because – well, it was never going to be paid by BentleyForbes Holdings or

to the Note it executed, the court would have to modify the SPA's definition of "Purchaser." This the parol evidence rule does not allow. Accordingly, the court concludes the parties intended that the provisions set forth in section 7 of the Closing Statement and Annex A apply only if BF Equities was the maker of the Note. As a consequence, BF Holdings cannot avoid paying the Note on the ground that Annex A provides the exclusive remedy in the event the Note is not paid.[67]

### c.   Whether SKN Committed a Material Breach

BF Holdings contends that where a promissory note is inextricably intertwined with other agreements, a breach of those agreements provides a defense to collection of the note.[68] "As a general rule, every breach of contract gives rise to a claim for damages. If the breach is material

---

Equities because . . . the closing statement said . . . you'd unwind the transaction, or it would be paid by a lender's proceeds if it's a 100 percent CTL loan"); see also Wehba Decl., ¶ 3. SKN objects to this testimony, but focuses most of its objections on Wehba's description of the transaction as involving credit tenant lease ("CTL") financing and his discussion of what CTL financing encompasses. (Objections at 1-4.) SKN's only specific objection to Wehba's statement that the project was to be 100% financed is that the testimony is irrelevant. The testimony is relevant because it makes more probable BF Holdings's stated reason for issuing the Note; that it would be repaid from the proceeds of CTL financing, or voided as part of the unwinding of the transaction as set forth in Annex A. The objection is therefore overruled.

[67]In its amended answer, BF Holdings raised mistake of fact as an affirmative defense. (Amended Answer, ¶ 12.) Because BF Holdings did not argue this defense in its opposition to SKN's motion for summary judgment, or adduce evidence supporting it, the court does not consider the merits of the defense in deciding the motion. It notes, however, that the extrinsic evidence suggests both parties intended that BF Holdings execute the Note, which may give rise to an inference of mutual mistake.

BF Holdings also raises estoppel as an affirmative defense. (Amended Answer, ¶ 2.) To establish estoppel under New York law, "a party must prove that it relied upon another's actions, its reliance was justifiable, and that, in consequence of such reliance, it prejudicially changed its position." *Flushing Unique Homes, LLC v. Brooklyn Federal Sav. Bank*, 100 A.D.3d 956, 958, 954 N.Y.S.2d 606 (N.Y. Sup. Ct. 2012). To the extent SKN knew it would assert that Annex A did not apply to a Note executed by BF Holdings, but nonetheless demanded BF Holdings be the maker of the Note, it could potentially be estopped from arguing that Annex A does not apply. Because BF Holdings does not argue the point in its opposition, however, the court need not consider it in deciding the motion.

[68]Opposition at 12-13.

and the breaching party fails to cure the breach within a reasonable period of time, the aggrieved party can elect to terminate the contract and claim damages for total breach." *Cary Oil Co., Inc. v. MG Refining and Marketing, Inc.*, 90 F.Supp.2d 401, 408 (S.D.N.Y. 2000).  Under New York law, "a breach is material if it is 'so substantial that it defeats the object of the parties in making the contract.'  Stated differently, the breach must 'go to the root of the agreement between the parties.'" *Qualcomm Inc. v. Texas Instruments Inc.*, 875 A.2d 626, 628 (Del. Supr. 2005) (quoting *Frank Felix Ass'n, Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)). "Conversely, where a breach causes no damages or prejudice to the other party, it may be deemed not to be material." *Metropolitan Nat. Bank v. Adelphi Academy*, No. 7389/08, 2009 WL 1477998, *4 (N.Y. Sup. Ct. May 27, 2009) (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 241.

        In determining whether a breach is material, New York courts consider the factors identified in the Restatement (Second) of Contracts. *Qualcomm*, 875 A.2d at 628.  These are:

> "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."
>
> RESTATEMENT (SECOND) OF CONTRACTS, § 241.

See also *Frank Felix Ass'n*, 111 F.3d at 289.  "The determination whether a material breach has occurred is generally a question of fact." *Metropolitan Nat. Bank*, 2009 WL 1477998 at *3 (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 241).

        BF Holdings alleges that SKN breached the contracts that formed part of a single integrated agreement with the Note in various ways.  First, it asserts that SKN failed to pay a security deposit of $1,250,000, and likewise failed to pay legal, title insurance, appraisal, due diligence,

and financial advisory costs of $1,322,455. The Closing Statement provides, however, that the security deposit was to be deducted from the proceeds of the bridge loans and wired to Bentley Forbes AMC. BF Holdings has adduced no non-conclusory evidence that this did not occur.[69] The Closing Statement provides that the legal, title insurance, appraisal, due diligence, and financial advisory costs were to be paid to various third parties. BF Holdings has proffered no evidence that, because of SKN's purported default, it has been required to pay these costs. Consequently, the court cannot determine on the present record that SKN's alleged failure to pay the security deposit or legal, title insurance, appraisal, due diligence, and financial advisory costs "cause[d] . . . damages or prejudice to" BF Equities or BF Holdings and constituted a material default.

BF Holdings has, however, adduced evidence that SKN failed to pay monthly interim rent of $50,000.[70] Courts have held that a failure to pay rent on time, or at all, can constitute a material breach See *Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*, 8 N.Y.3d 59, 65, 861 N.E.2d 69 (N.Y. 2006) ("An agreement to pay rent on a certain date is generally a

---

[69]Although Wehba states in his declaration that SKN "failed to pay the required security deposit," he does not explain how it is that the amount was not deducted from the proceeds of the bridge loan before those proceeds were paid to SKN. (See Wehba Decl., ¶ 20.)

[70]*Id.* At oral argument, SKN argued that failure to make the interim rent payments was not a material breach vis-á-vis BF Holdings because the rent was to be paid to BF Equities. This argument ignores the fact that the Closing Statement requiring SKN to pay rent to BF Equities, and the Note requiring BF Holdings to pay SKN, were not unrelated transactions, but two parts of a single transaction. Courts have held that where multiple agreements constitute a single integrated contract, a breach of one agreement can constitute a material breach of the entire transaction rendering the other agreements unenforceable. See *Parr v. Alderwoods Grp., Inc.*, 268 Va. 462, 467-68 (Va. 2004) (holding, in a case where the court construed an asset purchase agreement, management agreement, non-compete agreement, and lease as a single contract, that defendant's material breach of one agreement rendered the other agreements unenforceable); see also *Hackel v. F.D.I.C.*, 858 F.Supp. 289, 293 (D. Mass. 1994) (holding that a lease, note, and limited guarantee executed as part of a sale/leaseback were all part of a single integrated transaction, and "[t]herefore, when the FDIC disaffirmed the Lease, it necessarily repudiated the entire agreement, of which the Lease was an integral part. As a result, the Note and Limited Guaranty, other integral parts of the same agreement, became null and void and, thus, unenforceable").

material term of a lease"); see also *Encompass Ins. Co. of America v. English*, No. 11 Civ. 2606(KMW), 2013 WL 796309, *5 (S.D.N.Y. Mar. 5, 2013) ("These allegations, particularly those regarding late payment of rent, may constitute 'material' breaches"); *Fifty States Mgmt. Corp. v. Pioneer Auto Parks*, 46 N.Y.2d 573, 578 (1979) ("A covenant to pay rent at a specified time, however, is an essential part of the bargain as it represents the consideration to be received for permitting the tenant to remain in possession of the property of the landlord. Often the landlord relies on timely payment of rent to meet is own outstanding obligations, such as a mortgage on the demised premises"); *Nat'l Shoes v. Annex Camera & Elecs.*, 114 Misc.2d 751,752, 452 N.Y.S.2d 537 (N.Y. City Civ. Ct. 1982) ("The second issue that I must resolve is whether the lessee's conduct here in failing at times to pay rent when due constitutes a breach of a substantial obligation of the lease. It has been uniformly held that such conduct may indeed constitute such a violation. The obligation to pay rent under a lease in a timely manner is a primary obligation of a tenancy" (collecting cases)), superseded by statute on other grounds as recognized in *326-330 East 35th Street Assoc. v. Sofizade*, L&T No. 59715/01, 2001 WL 1263403 (N.Y. City Civ. Ct. June 29, 2001); see *id.* at 539 (entering a judgment of possession with a temporary stay and noting that "[f]rom the time that the tenant entered into possession under its lease it has been in arrears in the payment of its rent").

Applying the Restatement factors to SKN's nonpayment of rent, the first factor examines "the extent to which the injured party will be deprived of the benefit which he reasonably expected." SKN was to pay rent within three business days of the date on which it collected rent from the existing tenants.[71] Under section 5 of the Lease Agreement, tenants were required to pay rent on the tenth day of each month.[72] The transaction closed on December 30, 2011; consequently, SKN missed both payments due before the maturity date of BF Holdings's Note,

---

[71]Closing Statement, § 6(a).

[72]Lease Agreement, § 5(a).

and every payment thereafter.[73]  Because the transaction was a sale/leaseback, SKN's rental payments were intended to fund or refinance the purchase of the property and generate a profit.[74] Had BF Equities obtained permanent financing, it would not have been able to use SKN's expected rental payments to service its debt.[75]  Consequently, on the present record, this factor weighs in favor of a finding of material breach.

The second factor considers "the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived."  There is no evidence on the record indicating BF Holdings has any opportunity outside this action to obtain the compensation it is due.  Once again, therefore, on the present record, this factor weighs in favor of a finding of material breach.

The third relevant factor is "the extent to which the party failing to perform or to offer to perform will suffer forfeiture."  A finding of materiality could excuse BF Holdings from paying the Note; this would cause a forfeiture, however, only if SKN already transferred title of the property to BF Equities.  Although at the hearing, SKN's lawyer asserted that it was undisputed

---

[73]Wehba Decl., ¶ 20.

[74]*Id.*, ¶¶ 2-3.

[75]SKN argued at the hearing that the failure to make $100,000 in rent payments cannot be deemed material when it is asserted as a defense to paying a Note for more than $11 million. Materiality, however, is not judged by dollar value, but by whether the breach "go[es] to the root or essence of the agreement between the parties, or . . . touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract."  *11 South Laundry, Inc. v. MCD Assets, LLC*, 39 Misc.3d 1218(A), 2013 WL 1788022, *5 (N.Y. Sup. Ct. Apr. 18, 2013) (quoting *New Windsor Volunteer Ambulance Corps, Inc. v. Meyers*, 442 F3d 101, 117 (2d Cir. 2006)); *Wiljeff, LLC v. United Realty Management Corp.*, 82 A.D.3d 1616, 1617, 920 N.Y.S.2d 495 (N. Y. App. Div. 2011) (same); see also *Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.*, No. 03 Civ. 8259(CSH), 2007 WL 1988150, *9 (S.D.N.Y. July 10, 2007) ("A fundamental principle of contract law is that a material breach of a contract by one party, which 'substantially defeats the purpose of that contract,' discharges the further contractual obligations of the non-breaching party," quoting *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997)).  Here, since the transaction involved a sale and leaseback of property, pursuant to which the payment of rent was to be used to service the debt incurred to purchase the property, a jury could find that a failure to make rent payments frustrated an essential purpose of the contract.

that title to the property had transferred, and although this appears likely based on the terms of the parties' agreement, the evidence adduced on this point is at best ambiguous.[76] On the present record, therefore, this factor is neutral.

The fourth factor is "the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances." As the evidence indicates that SKN has made no payments in the more than nine months since the transaction closed,[77] the court cannot find that it intends to cure its breach. Consequently, on the present record, this factor weighs in favor of a finding of material breach.

The fifth and final factor is "the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing." There is no

---

[76]At Wehba's deposition, SKN's attorney asked Wehba to describe what "occurred" in connection with the transaction, but his follow-up questions were couched in terms of what "would have" happened rather than what actually happened:

> "Q: So we've been talking about this in the periphery, but I'd like to you to just walk me through the entire transaction that happened here so that we can understand – so that we can make sure that we're both on the same page about what you contend as the representative of BentleyForbes Holdings and BentleyForbes Equities occurred in the transaction. So, first, the first thing that I understand is that there was an agreed-upon purchase price of $25 million. Is that correct?
> A. Correct.
> Q. Okay. And in exchange for that agreed-upon purchase price of $25 million, SK Networks *would convey title* to the property to BentleyForbes Equities. Is that correct?
> A. Yes.
> Q. Okay.
> A. Along with the lease.
> Q. Right. Title to the – title to the property and *then there would be* a lease for twenty years. Is that correct?
> A. Yes, uh-huh." (Aug. 16 Wehba Depo. 189:5-190:2.) (emphasis added).

Neither party proffered a document that transferred title or the unequivocal testimony of any witness that title was transferred. Given the uncontroverted evidence that both parties failed to perform certain of their obligations in connection with the transaction, and given the absence of any clear evidence that BF Equities now owns the property, the court cannot say on the basis of the present record that this fact is undisputed.

[77]See Wehba Decl., ¶ 20.

evidence that SKN was unable to make interim rent payments, particularly given that it received bridge loan proceeds of more than $10,000,000. Even if BF Holdings's nonpayment of the Note compromised SKN's financial condition in some way, the note did not mature until two months after the transaction closed; the fact that it was not paid thus does not explain SKN's failure to make the initial two interim rent payments. On the present record, therefore, this factor thus weighs in favor of a finding of material breach.

Having reviewed each of the factors, the court concludes that BF Holdings has raised triable issues of fact as to whether SKN's failure to make interim rent payments as required was a material breach of the agreements that formed part of the same transaction as the Note, and thus excused BF Holdings' nonperformance of its obligations under the Note.[78]

## C.    Whether Viewed Alone, the Note Fails for Lack of Consideration

Assuming that "Purchaser" as defined in the SPA and Closing Statement refers only to BF Equities, as SKN asserts, and thus that section 7 and Annex do not apply and do not require the unwinding of the transaction, BF Holdings contends that the Note is unenforceable because BF Holdings received no consideration for its execution of the Note.[79] BF Holdings maintains that the Note was used to finance BF Equities' purchase of the property, and thus only BF Equities received any consideration.[80]

SKN argues that BF Holdings waived this argument by failing to raise it in either its answer

---

[78]BF Holdings also alleges that SKN misrepresented its creditworthiness and that this breached a provision in the SPA that required that all written information provided by SKN during negotiations and due diligence be true, complete, and accurate in all material respects. (SPA, § 5.1(u).) Although BF Holdings has adduced evidence that SKN's credit rating was material to its willingness to enter into the transaction, it has adduced no evidence that SKN provided written material that misrepresented its creditworthiness. On the present record, therefore, the court cannot find that the § 5.1(u) applies. Moreover, SKN has proffered evidence that raises triable issues of fact as to whether BF Equities relied on any representations concerning SKN's credit rating. (Reddy Decl., Exh. 4.) Thus, this asserted breach does not provide a basis for denying SKN's motion for summary judgment on its enforcement of the promissory note claim.

[79]Opposition at 15.

[80]Bhimani Decl., Exh. 1 at 187:19-25.

or amended answer.[81] "While state law defines the nature of [affirmative] defenses, the Federal Rules of Civil Procedure provide the manner and time in which defenses are raised and when waiver occurs." *Healy Tibbets Const. Co. v. Ins. Co. of N. Am.*, 679 F.2d 803, 804 (9th Cir. 1982) (citing *Morgan Guaranty Trust Co. of New York v. Blum*, 649 F.2d 342, 344 (5th Cir. Unit B 1981)). Rules 8(a) and (c) provide that a defendant's failure to raise an "affirmative defense" in its answer effects a waiver of that defense. *In re Adbox, Inc.*, 488 F.3d 836, 841 (9th Cir. 2007) (citing *Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005); 5 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE § 1278 (2d ed. 1990)). Rule 8(c) specifically lists failure of consideration as an affirmative defense that must be alleged in a responsive pleading. FED.R.CIV.PROC. 8(c).

BF Holdings did not specifically raise lack of consideration as an affirmative defense in its amended answer.[82] The Ninth Circuit, however, has "liberalized the requirement that defendants must raise affirmative defenses in their initial pleadings." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001). Specifically, it has held that an affirmative defense not raised in an answer may be asserted for the first time in opposition to a motion for summary judgment or a motion for judgment on the pleadings, so long as no prejudice to the opposing party results. *Id.*; *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984) (citing *Healy Tibbitts Constr. Co.*, 679 F.2d at 804). The key to determining the sufficiency of the pleading of an affirmative defense is whether the opposing party had fair notice of the defense. *Simmons v. Navajo County Arizona*, 609 F.3d 1011, 1023 (9th Cir. 2010) (citing *Wyshak v. City Nat'l Bank*, 607 F.2d 824,

---

[81]Reply at 8-9.

[82]In its answer, BF Holdings reserved "all affirmative defenses under Rule 8(c) of the Federal Rules of Civil Procedure and any other defenses, at law or in equity, that may now exist or in the future be available based on discovery and further factual investigation in this case." This is unavailing, however. "An attempt to reserve affirmative defenses for a future date is not a proper affirmative defense in itself. Instead, if at some later date defendants seek to add affirmative defenses, they must comply with Rule 15 of the Federal Rules of Civil Procedure. Defendants cannot avoid the requirements of Rule 15 simply by reserving the right to amend or supplement their affirmative defenses." *Miller v. S&S Hay Co.*, No. 1:12–CV–01796–LJO–SMS, 2013 WL 4679647, *3 (E.D. Cal. Aug. 30, 2013) (citations omitted).

827 (9th Cir. 1979); *In re Gayle Sterten*, 546 F.3d 278, 285 (3d Cir. 2008) (noting that "the proper focus of our inquiry" is whether framing the defense as the denial of an allegation in the complaint "specifically deprived [plaintiff] of an opportunity to rebut that defense or to alter her litigation strategy accordingly")).

SKN does not argue that it was prejudiced by the fact that BF Holdings did not raise a failure of consideration defense in its amended answer, and the court can conceive no prejudice. SKN has been well aware throughout the litigation of BF Holdings' position that the Note was part of a CTL financing transaction documented in the SPA, Closing Statement, and Lease Agreement. It has also been well aware of BF Holdings' contention that the agreed-upon remedy for failure to pay the Note was the unwinding of the transaction, not a suit to enforce the Note. The natural corollary of these positions is that if the Note is viewed as a freestanding contract, no consideration supports the Note. None of the parties' discovery and none of the parties' legal arguments would have changed had this defense been expressly pled rather than raised in opposition to summary judgment. Accordingly, the court concludes that BF Holdings's failure to plead the defense does not preclude it from raising it at this stage. See *Rivera*, 726 F.2d at 566 ("Healy Tibbitts' holding that, absent prejudice to the plaintiff, a defendant may raise an affirmative defense in a motion for summary judgment for the first time is controlling here. No prejudice has been claimed by appellants. Accordingly, we hold that Anaya's failure to raise the defense of the statute of limitations in his initial pleading does not preclude him from making a motion for summary judgment based on that defense").

BF Holdings's argument, however, is unavailing. "(1) To constitute consideration, a performance or a return promise must be bargained for. (2) A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise. . . . (4) *The performance or return promise . . . may be given by the promisee or by some other person*." REST. 2D CONTR. § 71 (emphasis added). See *id.*, cmt. e ("It matters not from whom the consideration moves or to whom it goes. If it is bargained for and given in exchange for the promise, the promise is not gratuitous"); *id.*, Illustration 15 ("A makes a promissory note payable to B in return for a payment by B to C. The

33

payment is consideration for the note"); 3 WILLISTON ON CONTRACTS § 7:20 (4th ed. 2013) ("In short, as long as the promisor has received the performance or return promise it bargained for, within the terms of its offer, there simply is no difference whether that consideration is furnished by the promisee or by some third person"); see also *In re 37-02 Plaza LLC*, 387 B.R. 413, 418, 419 (Bankr. E.D.N.Y. 2008) ("A benefit to a third party may satisfy the requirement of consideration. As one court found, 'under contract law, a contract is supported by consideration even if the consideration flows solely to a third party,'" quoting *In re Asia Global Crossing, Ltd.*, 344 B.R. 247, 252 (Bankr. S.D.N.Y.2006)). Here, it is undisputed that BF Equities received the property, a bargained for benefit, in partial exchange for the Note. Because consideration was received by a third party, BF Holdings's argument that the Note lacked consideration fails.

**D.     Whether SKN is Entitled to Summary Judgment on BF Holdings's Counterclaims**

**1.     Whether the SPA's Forum Selection Clause Bars the Counterclaims**

SKN argues all of BF Holdings's counterclaims are barred because the claims are based on the SPA, which contains a forum selection clause requiring that suit be filed in Korea.[83] Specifically, the SPA designates the Seoul Central District Court as the forum for the resolution of all disputes arising out of the agreement. The SPA also contains a choice of law provision stating that the "agreement shall be governed and interpreted by the Laws of Korea, without regard to its conflict of law principles."[84]

BF Holdings contends that SKN waived its right to enforce the forum selection clause by initiating litigation in this court.[85] SKN counters that the court must evaluate whether it waived its right to enforce the forum selection clause under Korean law, given the SPA's choice of law

---

[83]MSJ at 14.

[84]SPA § 11.8.

[85]Opposition at 16.

provision.[86] It asserts, moreover, that its decision to file this action does not constitutes a waiver under either Korean or federal law.[87]  Given SKN's argument, the court must determine, as a threshold matter, what law controls whether SKN waived it right to enforce the forum selection clause.  An antecedent question is what conflict-of-law rules apply.

"[A] federal court sitting in diversity applies the conflict-of-law rules of the state in which it sits." *Audio Marketing Services, S.A.S. v. Monster Cable Products, Inc.*, No. C 12–04760 WHA, 2013 WL 633202, *3 (N.D. Cal. Feb. 20, 2013) (citing *Schoenberg v. Exportadora de Sal, S.A. de C. V.*, 930 F.2d 777, 782 (9th Cir. 1991)).  Thus, California choice-of-law principles apply in determining whether California or Korean law governs the waiver issue.

In general, "California uses the test set forth in *Nedlloyd Lines B.V. v. Superior Court*[, 3 Cal.4th 459 (1992),] to determine whether to enforce a choice of law provision.  This test draws heavily on section 187 of the Restatement Second of Conflict of Laws[.]"  *It's Just Lunch Intern. LLC v. Island Park Enterprise Grp., Inc.*, No. EDCV 08-367-VAP (JCRx), 2008 WL 4683637, *2 (C.D. Cal. Oct. 21, 2008) (citations omitted).

> "Under *Nedlloyd*, California will apply the law indicated by the choice of law provision where: '[1] the chosen state has a substantial relationship to the parties or their transaction,' or where '[2] there is any other reasonable basis for the parties' choice of law.  If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law.'  Where either test is met, the court proceeds to the second step and 'determine[s] whether the chosen state's law is contrary to a fundamental policy of California.  Once the party who seeks application of the choice of law provision demonstrates a substantial relationship, the party who would avoid the choice of law provision bears the burden of showing that the California law embodies a fundamental policy.'  *Id.* (quoting *Nedlloyd*, 3 Cal.4th at 466).

---

[86]MSJ at 16.

[87]*Id.* at 14-22.

35

South Korea has a substantial relationship to the parties and their transaction because SKN is a South Korean corporation.  See *Audio Marketing Services*, 2013 WL 633202 at *3 ("This factor is satisfied where, as here, one of the parties is domiciled in the chosen state"); *It's Just Lunch Intern. LLC*, 2008 WL 4683637 at *2 ("This requirement is easily satisfied: Plaintiff has a substantial relationship with Nevada because IJL is a Nevada limited liability company").  Moreover, the transaction concerns the sale of real property located in Seoul, South Korea.  The court thus proceeds to the second step of the *Nedlloyd* analysis.

The second step requires that the court "determine whether the chosen state's law is contrary to a fundamental policy of California."  Where enforcement of the choice of law provision would contravene a fundamental policy of California, the court must decline to enforce the provision if it finds that 'California has a materially greater interest than the chosen state in the determination of a particular issue. . . .'" *It's Just Lunch Intern. LLC*, 2008 WL 4683637 at *3 (quoting *Nedlloyd*, 3 Cal.4th at 466).  BF Holdings pleads counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief.[88]  It has made no showing that a fundamental California policy requires application of California's law to these claims.  See *Nedlloyd*, 3 Cal.4th at 468 ("We perceive no fundamental policy of California requiring the application of California law to Seawinds's claims based on the implied covenant of good faith and fair dealing.  The covenant is not a government regulatory policy designed to restrict freedom of contract, but an implied promise inserted in an agreement to carry out the presumed intentions of contracting parties. . . .  Because Seawinds has identified no fundamental policy of our state at issue in its essentially contractual dispute with Nedlloyd, the second exception to the rule of section 187 of the Restatement does not apply").  Consequently, the court enforces the choice of law clause, and applies Korean law to determine whether SKN waived its right to enforce the forum selection clause by filing the present action in the Central District.

SKN argues that under Article 506 of the Civil Act of Korea, the waiver of a right requires

---

[88]Counterclaims, ¶¶ 35-72.

that the obligee express its intent to give up the right to the obligor.[89] Article 506 provides: "If the obligee declares to the obligor an intention to release the obligor from the obligation, such obligation shall be extinguished: *Provided*, That a release cannot be set up against a third person who has a reasonable interest."[90] While there is no evidence that SKN has expressly declared an intent to waive the forum selection clause, Article 506 does not state that release from an obligation necessarily *requires* an express declaration of an intent to release. It merely states that such a declaration will waive the obligation.

As support for its argument that there has been no waiver under Article 506, SKN proffers a decision of the Supreme Court of Korea.[91] Supreme Court Decision 2004Da50426 (S. Kor. Feb. 15, 2007). There, the Court stated: "Waiver of an obligation need not always be by means of a clear expression of intent, but a waiver of an obligation shall be recognized through a specific behavior or expression of intent by the creditor, provided that such recognition follows a strict interpretation of the behavior or the expression of intent by the creditor in accordance with the content of the relations of the rights in question." *Id.*[92]

SKN argues its filing of this action did not evidence an intent to waive application of the forum selection clause because only BF Holdings was sued, not BF Equities; the Note is neither part of nor referenced in the SPA; and the SPA has a merger clause.[93] SKN proffers the declaration of Professor Sung-Young Kim, a professor at the SungKyunKwan University Law

---

[89]MSJ at 16.

[90]Minbeob [Civil Act], art. 506 (S. Kor.), *available at* http://www.moleg.go.kr/FileDownload.mo?flSeq=33629.

[91]Reddy Decl., ¶ 12; *id.*, Exh. 9 (Supreme Court Decision 2004Da50426 (S. Kor. Feb. 15, 2007)).

[92]BF Holdings cites to *Electro-Mechanical Corp. v. Riter Eng'g Co.*, No. 2:10–cv–975 TS, 2011 WL 2118704 (D. Utah May 25, 2011), for the proposition that SKN's lawsuit waived the forum selection clause because its alleged breach of the Note arises out of or is inextricably intertwined with the SPA. (Opposition at 22.) This case is not controlling since, as noted, whether there has been a waiver is governed by Korean law.

[93]MSJ at 17.

School in Seoul, South Korea, whom it states is an expert on Korean law.[94]  "In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.  The court's determination is "a ruling on a question of law."  FED.R.CIV.PROC. 44.1.

In his declaration, Professor Kim notes that (1) the SPA contains a merger clause; (2) the SPA defines "Transaction Documents" as including only the SPA, "the short-form Korean language Purchase and Sale Agreement, Seller's Power of Attorney for Court Registration of Title Transfer, Seller's Closing Documents and Purchaser's Closing Documents"; (3) the Note does not mention the SPA or any other Transaction Document; and (4) the Note is between different parties and is not defined as part of the "entire agreement" reflected in the SPA.[95]  Professor Kim does not explain why, assuming the truth of these facts, they compel the conclusion under Korean law that SKN did not waive its rights under the forum selection clause.  His opinion is wholly conclusory, merely reciting in summary fashion the legal argument that SKN has advanced in its brief and that the court has rejected under New York law.  Other than saying that the conclusion follows "as a matter of Korean law,"[96] he provides no analysis of Korean law that demonstrates the facts he recites necessitate a finding that SKN did not waive the forum selection clause as a matter of Korean law.  Accordingly, the court finds his conclusions unpersuasive.  See *HFGL Ltd. V. Alex Lyon & Sons Sales Managers and Auctioneers*, 264 F.R.D. 146, 148 (D.N.J. 2009) ("[I]t is within the Court's discretion to 'reject even the uncontradicted conclusions of an expert witness and reach [its] own decisions on the basis of independent examination of foreign legal authorities,'" citing *Nat'l Group for Communications and Computers. Ltd., v. Lucent Techs. Int'l., Inc.*, 331 F.Supp.2d 290, 294 (D.N.J.2004)); see also *Bel-Ray Co., Inc. v. Chemrite Ltd.*, 181 F.3d 435, 440 (3d Cir. 1999) (Rule 44.1 "provides courts with broad authority to conduct

---

[94]Reddy Decl., ¶ 11; *id.*, Exh. 8 (Expert Report of Sung-Young-Kim) ("Kim Report"), ¶¶ 1-7.

[95]Kim Report, ¶¶ 29-31.

[96]*Id.*, ¶¶ 28, 31.

their own independent research to determine foreign law"); *Argonaut P'ship, L.P. v. Bankers Trustee Co. Ltd.*, No. 96 CIV. 1970 (MBM), 96 CIV. 2222 (MBM), 1997 WL 45521, *9 (S.D.N.Y. Feb. 4, 1997) ("A court may reject the opinion of an expert on foreign law or give it whatever probative value the court believes it deserves," citing *United States v. First Nat'l Bank of Chicago*, 699 F.2d 341, 344 (7th Cir. 1983)).

Where the parties provide insufficient information to permit the court to apply foreign law,[97] the court can apply local law. *Commercial Ins. Co. of Newark, N.J. v. Pacific-Peru Const. Corp.*, 558 F.2d 948, 952 (9th Cir. 1977) ("We apply the principle of the Restatement (Second) of Conflicts: '(W)here either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case in accordance with its own local law, . . . The forum will usually apply its own local law for the reason that in this way it can best do justice to the parties . . . . When both parties have failed to prove the foreign law, the forum may say that the parties have acquiesced in the application of the local law of the forum. . . ," quoting RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 136, cmt. h, (1971); *id.* at § 6(2)(g)). See *Interpool Ltd. v. Char Yigh Marine (Panama) S.A.*, 890 F.2d 1453, 1458 (9th Cir. 1989) ("Where no authority, or insufficient authority, is presented by the parties about foreign law, a court may conclude that the parties have acquiesced in the application of the law of the forum"); see also *Baker v. Booz Allen Hamilton, Inc.*, 358 Fed. Appx. 476, 481 (4th Cir. Dec. 28, 2009) (Unpub. Disp.) ("[W]here a party fails to carry its burden of proving foreign law under Rule 44.1, the forum law should apply," citing *Ferrostaal, Inc. v. M/V Sea Phoenix*, 447 F.ed 212, 216 (3d Cir. 2006)); *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 440 (3d Cir. 1999) ("The parties therefore generally carry both the burden of raising the issue that foreign law may apply in an action, and the burden of adequately proving foreign law to enable the court to apply it in a

---

[97]Here, the parties' failure to provide adequate information concerning Korean law is compounded by the fact that the court has been unable to conduct independent research regarding the subject. Despite visiting multiple websites and databases of Korean law, and despite contacting librarians for assistance, the court has been unable to find relevant Korean authority that is translated into English.

particular case. Where parties fail to satisfy either burden the court will ordinarily apply the forum's law" (internal citations omitted)); *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 631 (7th Cir. 1981) ("We agree with the authors of the Restatement (Second) who state, 'where either no information, or else insufficient information, has been obtained about the foreign law, the forum will usually decide the case is accordance with its own local law except when to do so would not meet the needs of the case or would not be in the interest of justice'"); *Loebig v. Larucci*, 572 F.2d 81, 84-86 (2d Cir. 1978) (concluding that German law applied but applying New York law in the absence of proof of German law).

In this case, Professor Kim's testimony – proffered by SKN – is conclusory and unpersuasive. BF Holdings offers no analysis of Korean law and cites no Korean authority. Because the parties have not provided sufficient information to permit the court to ascertain and apply Korean law, it applies the law of the forum state.

In California, "forum selection clauses are valid and may be given effect, in the court's discretion and in the absence of a showing that enforcement of such a clause would be unreasonable." *Smith, Valentino & Smith, Inc. v. Superior Court*, 17 Cal.3d 491, 496 (1976). see also *Trident Labs, Inc. v. Merrill Lynch Commercial Finance Corp.*, 200 Cal.App.4th 147, 153 (2011); *Lifeco Services Corp. v. Superior Court*, 222 Cal.App.3d 331, 334 (1990).

In *Smith*, *Valentino & Smith*, the parties' contract contained reciprocal forum selection clauses that rqeuired Smith to bring actions in Philadelphia and real party in interest Life Assurance Company of Pennsylvania to bring actions in Los Angeles. 17 Cal.3d at 494. Smith sued in Los Angeles and argued, *inter alia*, that Assurance should be barred from enforcing the forum selection clause because it had previously breached the clause by filing a separate action against him in Philadelphia. *Id.* at 496. The Supreme Court acknowledged that the prior suit, which sought a foreign attachment, "was a relevant factor to be considered by the trial court in determining whether enforcement of the clause would be unreasonable," but declined to hold that it constituted an absolute bar to enforcement. The court noted that Smith had elected not to challenge the earlier breach, and had allowed the case to go by default. It observed that under California and Pennsylvania law, objections to venue are waived unless promptly presented. *Id.*

40

at 497.  Second, the court stated, "given the relatively minor nature of the prior action when compared to the present proceedings, the trial court reasonably might have concluded that Assurance's prior breach of the clause was *de minimis*."  *Id.* at 498.

In *Lifeco Services*, two companies sued their president, Robison, in California, seeking injunctive relief after he allegedly threatened to prevent employees from accessing the company's premises, interfered with contractual relationships, and resorted to other forms of "self help." *Id.* at 333.  Robison filed a cross-complaint for breach of contract, fraud, unjust enrichment, intentional infliction of emotional distress, wrongful termination and other torts.  *Id.* at 334.  The trial court denied petitioners' motion to dismiss or stay the cross-complaint based on forum selection clauses in various agreements that governed the employment relationship, and provided that the exclusive venue for the resolution of dispute was Texas.  *Id.* at 335.  Citing *Smith, Valentino & Smith*, the Court of Appeal reversed, holding that petitioners' response to a perceived emergency was not a sufficient circumstance to deny enforcement of the forum selection clause. *Id.* at 336-37.  The court stated:

> "The record compels a finding that petitioners in good faith filed the preliminary
> [injunction] action in California on the basis of perceived necessity.  Their action
> is not a waiver of their right to a Texas forum to settle the broader dispute among
> the parties which touches on all aspects of their relationship."  *Id.* at 337.[98]

In contrast to the circumstances in *Smith, Valentino & Smith* and *Lifeco Services*, enforcement of a forum selection is unreasonable if a party extensively litigates a case outside the required forum without justification and then seeks to invoke the clause.  In *Trident Labs*, the plaintiff borrower filed suit in California in violation of a forum selection clause that required that it sue in Illinois, but allowed the lender to sue in Illinois or anywhere else the borrower or collateral were located.  200 Cal.App.4th at 150-51.  The parties litigated the action for more than

---

[98]The court concluded that the record was insufficient to determine whether the claims in the complaint and cross-complaint were so closely related in a transactional sense that they should be tried together.  It thus noted that the trial court retained discretion on remand to stay the complaint as well as the cross-complaint.  *Id.* at 337.

41

19 months, after which the lender moved to dismiss or stay the suit based on the forum selection clause. *Id*. at 151. The court held the clause could not be enforced, because "[a] delay of more than 19 months, for which no justification is offered, and during which the party who seeks to change venue has repeatedly invoked the rights available to California litigants, does not survive that test of reasonableness." *Id*. at 155. The court distinguished *Lifeco Services*, in which "the petitioners had good reason to initiate a suit for an injunction in one forum and then insist on litigating the entire controversy in another," and concluded that the lender had offered "no reason whatsoever" for having litigated in California for 19 months. *Id*. at 157. Under the circumstances, the court stated, enforcing the forum selection clause would be "unreasoanble as a matter of law." *Id*.

Here, *Trident Labs* controls. SKN argues that it filed suit in California partially due to concerns that a Korean court would be unable to exercise personal jurisdiction over BF Holdings.[99] SKN had no need for emergency relief, however, as did the petitioners in *Lifeco Services*, and there is no suggestion that it could not have attempted to secure personal jurisdiction over BF Holdings in Korea before suing here. This is particularly true since it was suing on a Note that was clearly part of an integrated transaction involving the sale of a large commercial property in Seoul. SKN filed this action in October 2012, and litigated it extensively, seeking, among other things, to attach BF Holdings' assets. Consequently, the court concludes that it would be unreasonable to enforce the forum selection clause under these circumstances.[100]

---

[99]Yoo Chan Seo Declaration, Docket No. 60-2 (Sept. 23, 2013), ¶ 6.

[100]Moreover, even if SKN could demonstrate that it was reasonable to enforce the forum selection clause under these circumstances, the court would conclude that the entire action should be stayed or dismissed because the counterclaims are transactionally related to SKN's suit to enforce the Note and raise issues that are inextricably intertwined with BF Holdings' defenses to enforcement of the Note. See *Lifeco Services*, 222 Cal.App.3d at 337. Because BF Holdings sues as the assignee of BF Equities, moreover, SKN would likely have no difficulty securing jurisdiction over it in Korea. As an assignee, BF Holdings stands in the shoes of BF Equities. A party that has entered into a contract that contains a forum selection clause consents to jurisdiction in that forum. See, e.g., *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n. 14. Since BF Equities consented to jurisdiction in Korea, and since BF Holdings sues as its assignee,

## 2. Whether BF Equities Validly Assigned the Second Through Fourth Counterclaims to BF Holdings

SKN next argues that BF Holdings cannot assert counterclaims based on the SPA, Closing Statement and Lease Agreement as the assignee of BF Equities because SPA bars assignments. The SPA provides, in relevant part, that "[n]one of the Parties to [the] Agreement may sell, assign or otherwise transfer any of its rights or obligations hereunder, without the prior written consent of the other Parties hereto."[101]

Citing Article 450 of Civil Act of Korea, SKN argues that under Korean law, this clause bars the assignment of claims and causes of action.[102] Article 450 states: "(1) The assignment of a nominative claim cannot be set up against the obligor or any other third person, unless the assignor has given notice thereof to obligor or the obligor has consented thereto. (2) The notice or consent mentioned in the preceding paragraph cannot be set up against a third person other than the obligor, unless it is put in writing with a certified fixed date."[103] BF Holdings has proffered evidence that it provided notice of the assignment to SKN,[104] while SKN has adduced evidence that

---

it too must be deemed to have consented to jurisdiction in Korea.

[101]SPA, § 11.2.

[102]Kim Report, ¶ 16. Professor Kim refers throughout his declaration to the "Civil Code of Korea," while SKN refers to the "Civil Act" in its motion and cites a document titled "Civil Act." The Civil Code of Korea contains 225 Articles, none of which corresponds to the sections cited by Professor Kim. See http://united-korea.org/code_civil/article_0000.htm. Accordingly, the court refers to the Civil Act.

[103]See Minbeob [Civil Act], art. 450 (S. Kor.).

[104] Wehba Decl., ¶ 23; Exh. D (Assignment). SKN objects to Wehba's testimony on the basis that it is irrelevant and that it should be excluded under Rule 403. SKN asserts the evidence is irrelevant because the issue is not whether a copy of the assignment was given to SKN, but whether it consented to the assignment. (Objections at 42-44.) SKN asserts that the assignment is barred by Article 450, which makes notice *or* consent dispositive. Professor Kim does not addresses whether an agreement that requires consent trumps the alternative requirements of the statute. Consequently, the court cannot conclude that Wehba's evidence of notice is irrelevant. SKN also objects that the probative value of Wehba's statement is outweighed by its tendency to mislead. (*Id.*) The court overrules this objection for the same reason: by citing to Article 450,

43

it never received notice.[105]  Consequently, triable issues of fact remain as to whether the assignment was invalid under Article 450.

Professor Kim asserts that Article 449 of the Korean Civil Act bars assignment of BF Equities' claims under the SPA, Closing Statement and Lease Agreement.  Article 449 provides: "(1) A claim may be assigned, except in cases where its nature does not so permit. (2) Where the parties have declared a contrary intention, a claim shall not be assigned: *Provided*, That such declaration of intention, cannot be set up against a third person acting in good faith."[106]  In its May 6, 2013, order, the court noted that "Article 449 does not indicate that a non-assignment clause barring the assignment of rights and obligations also prohibits the assignment of claims or causes of action.  As noted, the SPA's non-assignment clause does not specifically prohibit the parties from assigning or transferring claims or causes of action – only 'rights and obligations.'"[107]  Professor Kim asserts "[i]t is a firmly established principle under Korean law that a 'claim' [can] be assigned only in accompaniment with its underlying 'right.'  Hence, to the extent that the 'rights' of BF Equities under the SPA are not allowed to be assigned without consent of SK Networks, neither are the 'claims' derived from such 'rights' allowed to be independently

SKN put at issue whether it received a copy of the assignment.  Because it has not adduced evidence that under Korean law, the clause in the parties' contract requiring consent trumps the statute, Wehba's evidence is highly probative; absent evidence that the contract clause controls, no confusion will result.

[105]Kim Report, ¶ 16.

[106]*Id.*, ¶ 15; see also Minbebo [Civil Act], art. 449 (S. Kor.).  In his report, Professor Kim cites different language, which he suggests is found in Article 449, section 2 of the Civil Code of Korea: "an *in personum* right shall not be assigned if the party has expressed the objection thereto; provided, however, that the expression shall not be effective against a *bona fide* third party." (Kim Report, ¶ 15.)  As noted, SKN cites the Civil Act of Korea, and the Civil Code of Korea mentioned by Kim contains only 225 articles.  Because the court is unable to verify the language Professor Kim cites, it analyzes Article 449 of the Korean Civil Act.

[107]Order Granting Defendant's Motion to File 1st Amended Answer and Counterclaims, Docket No. 43 (May 6, 2013) at 16.

assigned."[108]  Professor Kim cites no legal authority supporting this opinion.  Consequently, the court finds it unpersuasive.

Finally, Professor Kim cites Article 6 of the Trust Act of Korea, which states: "Any trust which aims mainly at having the trustee proceed a litigation, shall be null and void."[109]  He cites two cases decided by the Korean Supreme Court, which purportedly hold that where an *in personam* right is assigned mainly for the purpose of proceeding with a lawsuit, this language applies even to assignments not considered trusts under the Trust Act.[110]  The cases, however, are not attached to Professor Kim's declaration or any of SKN's filings.  The court is therefore unable to validate Professor Kim's analysis and, as a practical matter, treats his assertions as unsupported.  Accordingly, for the reasons stated earlier, the court applies California law.

In California, a contractual provision prohibiting assignment does not preclude assignment of a cause of action for money damages.  *Trubowitch v. Riverbank Canning Co.*, 30 Cal.2d 335, 339 (1947) ("It is established that a provision in a contract or a rule of law against assignment does not preclude the assignment of money due or to become due under the contract or of money damages for the breach of the contract" (internal citations omitted)).  See also *Rosecrans v. William S. Lozier, Inc.*, 142 F.2d 118, 124 (9th Cir. 1944) ("Plaintiff is suing for damages for breach of contract, and he alleges that he is an assignee of the claim for breach.  The prohibition

---

[108]Kim Report, ¶ 18.

[109]Trust Act, art. 6 (S. Kor.), available at http://www.moleg.go.kr/FileDownload.mo?flSeq=31336.  In the document available at this URL, the cited language is found in Article 7.  Professor Kim's declaration quotes a Korean Supreme Court decision, to which he adds explanatory parentheticals, suggesting that Article 7 has been renumbered Article 6. (Kim Report, ¶ 21 ("Supreme Court of Korea has applied the above Article to assignments of rights and repeatedly held that "in the event an *in personam* right is assigned mainly for the purpose of proceeding with a lawsuit, Article 7 of the [then current] Trust Act [which is identical with Article 6 of the current Act] shall apply *mutatis mutandis* even if such assignment does not constitute trust under the Trust Act" (parentheticals added)).  Professor Kim quotes slightly different language: "[A]ny trust the main purpose of which is to have the trustee proceed with a lawsuit shall be null and void."  While the court cannot determine the origin of this language, it appears to have the same effect as Article 7 of the Trust Act.

[110]Kim Report, ¶ 21.

of the contract against assignment is against an assignment of the rights and privileges under the contract. This prohibition of assignment does not, however, prohibit the assignment of a claim for damages on account of breach of the contract"); *Shively v. Semi-Tropic Land & Water Co.*, 99 Cal. 259, 261 (1893) ("The assignment to plaintiff of the cause of action evidenced by this litigation was no violation of those provisions of the contract prohibiting its assignment"). Accordingly, section 11.2 of the SPA did not prohibit BF Equities's assignment of its causes of action to BF Holdings and the assignments are valid.

### 3.   Whether BF Holdings Can Assert a Counterclaim As a Third Party Beneficiary

BF Holdings's first counterclaim alleges that SKN breached the single, integrated agreement that was reflected in the SPA, Closing Statement, Lease Agreement and Note, and that it is entitled to sue for breach of that agreement as a third party beneficiary. SKN argues that this claim is barred because BF Holdings is not a third party beneficiary of the contract(s).[111] Specifically, it contends the SPA clearly contemplated that there would be no third party beneficiaries. Section 11.9 of the SPA, which is titled "No Third Party Beneficiaries,"[112] states: "Except as otherwise expressly provided, nothing in this Agreement shall convey any rights upon any Person which is not a party or permitted designee or assignee of a Party to this agreement."[113] Citing this language, SKN asserts that BF Holdings is not a party to the SPA or any other Transaction Document,[114] and that the Closing Statement conferred no benefit on it.[115] BF Holdings counters that, because the Note and Closing Statement were executed the same day, the parties knew at the time they executed the Closing Statement that BF Holdings would be the

---

[111]Motion at 24.

[112]SPA, § 11.9.

[113]*Id.*

[114]MSJ at 24.

[115]*Id.*

obligor on the Note.[116] As a result, it asserts, it is entitled to all of the protections afforded the obligor on the Note under the Closing Statement because the provisions of that document were intended to benefit the obligor.[117]

Neither party cites Korean law bearing on this issue.[118] Although SKN proffers Kim's declaration, he merely states, in wholly conclusory fashion, that "as a matter of Korean law," BF Holdings could not have been a third party beneficiary because the agreement said there were no third party beneficiaries.[119] This is insufficient to carry SKN's burden of proving the content of Korean law. Consequently, the court applies California law.

Under California law, "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." *Arata v. Bank of Am. Nat. Trust & Sav. Ass'n*, 223 Cal.App.2d 199, 205 (1963) (quoting CAL. CIV. CODE § 1559). "The test for determining whether a contract was made for the benefit of a third person is whether an intent to benefit a third person appears from the terms of the contract." *Id.* (quoting *Johnson v. Holmes Tuttle Lincoln–Mercury, Inc.*, 160 Cal.App.2d 290, 297 (1958) (internal citation omitted)). "The intent to make the obligation inure to the benefit of a third party must be clearly manifested by the contracting parties in order for the beneficiary to maintain an action. The contract does not have to be for the exclusive benefit of a third party to be enforceable by him; both contracting parties can receive benefits under an enforceable third party beneficiary contract." *Id.* (citations omitted). "If the terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person." *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal.App.4th 1004, 1022 (2009) (quoting *Johnson*, 160 Cal.App.2d at 297). "[T]he third person

---

[116]Opposition at 20.

[117]*Id.* at 20-21.

[118]See MSJ at 24-25; Reply at 14-15; Opposition at 19-21.

[119]Kim Report, ¶¶ 23-26.

need not be named or identified individually to be an express beneficiary. A third party may enforce a contract if it can be shown that he or she is a member of the class for whose express benefit the contract was made." *Kaiser Engineers v. Grinnell Fire Prot. Sys. Co.*, 173 Cal.App.3d 1050, 1055 (1985) (internal citations omitted).

"Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered." *Balsam v. Tucows Inc.*, No. CV 09–03585 CRB, 2009 WL 3463923, *3 (N.D. Cal. Oct. 23, 2009) (quoting *Landale–Cameron Court, Inc. v. Ahonen*, 155 Cal.App.4th 1401, 1411 (2007) (internal quotation marks omitted), aff'd, 627 F.3d 1158 (9th Cir. 2010). The intent inquiry is an objective one. See *Sy First Family Ltd. Partnership v. Cheung*, 70 Cal.App.4th 1334, 1341 (1999). The parties' intent must be determined from the contract's language if possible. CAL. CIV. CODE § 1638 ("The language of a contract is to govern its interpretation, if the language is clear is explicit, and does not involve an absurdity"); *id.*, § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"). The court may nonetheless consider extrinsic evidence. *Morey v. Vannucci*, 64 Cal.App.4th 904, 912 (1998) ("The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties, citing CAL. CIV. CODE §§ 1635–1656; CAL. CODE CIV. PROC. §§ 1859–1861, 1864); *id.* ("Extrinsic evidence is thus admissible to interpret the language of a written instrument, as long as such evidence is not used to give the instrument a meaning to which it is not reasonably susceptible").

SKN contends that BF Holdings was not an intended third-party beneficiary because the SPA disclaims the intention to benefit any third party beneficiaries. As noted, § 11.9 states: "No Third Party Beneficiaries. Except as otherwise expressly provided, nothing in this Agreement shall convey any rights upon any Person which is not a party or a permitted designee or assignee

of a Party to this Agreement." It is not clear that this section even applies to BF Holdings because, as discussed, there are triable issues of fact as to whether BF Holdings was a permissible assignee of BF Equities' causes of action.

Even if it does, however, contractual language disclaiming an intention to benefit third party beneficiaries does not automatically foreclose the parties' intent to benefit a third party. *Balsam v. Tucows, Inc.*, No. CV 09–03585 CRB, 2009 WL 3463923, *5 (N.D. Cal. Oct. 23, 2009) ("[I]t is of course possible for parties to intend to benefit third parties despite contractual language disclaiming third party beneficiaries"); see also *Jajco, Inc. v. Leader Drug Stores, Inc.*, No. C 12–05703 PJH, 2013 WL 2403593, *6 (N.D. Cal. May 31, 2013) ("[T]he Ninth Circuit held that a clause disclaiming any third-party beneficiaries is strong evidence of intent not to create any obligations to third parties, but is not necessarily dispositive of whether a third party qualifies as a beneficiary," citing *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1163 (9th Cir. 2010) (holding that "[g]iven the absence of any evidence to the contrary," a "No Third Party Beneficiaries" clause "unambiguously manifests an intent not to create any obligations to third parties")). Nonetheless, BF Holdings has adduced no evidence that the parties intended that it would receive any benefit from the contract; rather, it appears all benefits were to accrue to BF Equities. BF Holdings argues that Annex A to the Closing Statement evidences the parties' intent to benefit the obligor on the Note.[120] The problem with this argument is that it overlooks the fact that Annex A speaks only to a situation in which the Purchaser – i.e., BF Equities – fails to honor the Note. As the court found earlier, the extrinsic evidence the parties submitted does not permit the court to alter the unambiguous language of the contract. Thus, the court cannot determine that BF Holdings was a third party beneficiary of the contract based on Annex A and the fact that it executed the Note. Because BF Holdings makes no other argument, and proffers no other evidence raising triable issues of fact concerning its status as a third party beneficiary of the integrated agreements, the court must enter summary judgment in SKN's favor on the first

---

[120]Opposition at 21.

counterclaim.[121]

SKN also argues that BF Holdings's first counterclaim fails because BF Holdings has not adduced evidence of damages.[122] "Under a breach of contract theory, the plaintiff must demonstrate a contract, the plaintiff's performance or excuse for nonperformance, the defendant's breach, and damage to the plaintiff." *Amelco Electric v. City of Thousand Oaks*, 27 Cal.4th 228, 243 (2002); *Spinks v. Equity Residential Briarwood Apartments*, 171 Cal.App.4th 1004, 1031 (2009) ("A cause of action for breach of contract requires pleading of a contract, plaintiff's performance or excuse for failure to perform, defendant's breach and damage to plaintiff resulting therefrom," citing *McKell v. Washington Mut., Inc.*, 142 Cal.App.4th 1457, 1489 (2006)).

Wehba's deposition testimony suggests SKN's failure to pay the third parties identified in § 1 of the Closing Statement has led those parties to pursue payment from BF Holdings:

"Q. What damages has BentleyForbes Holdings suffered?

A. Well, all the -- all the above, all the -- vendors are going after us.

Q. What vendors?

A. S&P, CBRE, Kim & Chang, all that kind of stuff, for failure – for people who are not – for SK Networks' bills. They're all coming after us. And there have been, I think, you know, some other damages, such as giving back the – you know, you sell the property if what – if you have a lease and if it's on a 20-year lease and you sell it – sell the property from – you know, 14 percent over usually. Something like that. So that amount, too."[123]

---

[121]As noted earlier, although BF Holdings asserted mistake and estoppel as affirmative defenses, it did not argue those points in opposition to SKN's summary judgment motion, and adduced no evidence supporting them. Consequently, the court cannot find that there are triable issues of fact as to whether the reference to Purchaser in Annex A was intended to be a reference to any maker of the Note, including BF Holdings, such that it was an intended third party beneficiary of the integrated agreement.

[122]MSJ at 25.

[123]Reddy Decl., Exh. 2 at 349:4-18.

Wehba's testimony concerning SKN's failure to pay, title insurance, appraisal, due diligence, and financial advisory costs falls short of raising triable issues of fact concerning damages, because he does not say that BF Holdings has actually paid any third party or suffered some type of loss as a result of its refusal to do so. The second portion of Wehba's answer concerning a sale of the property is unintelligible and cannot raise triable issues of fact concerning damages as a result.[124]

Elsewhere in Wehba's deposition, his testimony is equivocal as to whether BF Holdings suffered any damages at all:

"Q. Did BentleyForbes Holdings suffer any damages?

A. I just don't know."[125]

Thus, even drawing all inferences in favor of BF Holdings, the court cannot say that it has raised triable issues regarding the fact that it suffered damages as a third party beneficiary of the integrated agreement. Accordingly, the court grants SKN's motion for summary judgment on BF Holdings's first counterclaim.

---

[124]Wehba may have been discussing the ultimate sale of the property. In his declaration, he states that "[i]t is not unusual for the owner of the property to realize profit of as much as 15% of the purchase price upon resale." (Wehba Decl., ¶ 3.) To the extent this was Wehba's reference, there are two problems with the assertion. First, BF Equities was to be the owner of the property. Thus, BF Holdings could not recover lost profits from the ultimate sale of the property as a third party beneficiary of the integrated agreement. Rather, it could claim such amount only as the assignee of BF Equities. Second, on the present record, there is insufficient information to show that lost profit related to the ultimate sale of the property were in the contemplation of the parties, such that they can be recovered for breach. See, e.g., *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal.App.3d 442, 455-56 (1990) ("It is often said that damages must be 'foreseeable' to be recoverable for breach of contract. The seminal case announcing this doctrine, still generally accepted as a limitation on damages recoverable for breach of contract, is *Hadley v. Baxendale* (1854) 156 Eng.Rep. 145. . . . [G]eneral damages are ordinarily confined to those which would naturally arise from the breach, or which might have been reasonably contemplated or foreseen by both parties, at the time they made the contract, as the probable result of the breach").

[125]*Id.* at 350:22-24.

### III. CONCLUSION

For the reasons stated, SKN's motion for summary judgment on its claim to enforce the promissory note is denied. SKN's motion for summary judgment on BF Holdings's first counterclaim is granted. Its motion for summary judgment on BF Holdings's second, third, and fourth counterclaims is denied.

DATED: November 7, 2013

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE